```
 1                UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
 2                     WESTERN DIVISION


 3

 4   UNITED STATES OF AMERICA,-    Docket No. 5:22-hc-2006-FL
                               -
 5        Plaintiff,           -    New Bern, North Carolina
                               -    December 20,2022
 6            v.               -    Competency Hearing
                               -
 7   TODD MICHAEL GIFFEN,       -
                               -
 8        Defendant.           -
     --------------------------------
 9
                  TRANSCRIPT OF COMPETENCY HEARING
10          BEFORE THE HONORABLE LOUISE WOOD FLANAGAN
                  UNITED STATES DISTRICT JUDGE.
11
     APPEARANCES:
12
     For the Plaintiffs:  United States Attorneys' Office
13                        By: Genna D. Petre
                          150 Fayetteville Street, Suite 2100
14                        Raleigh, NC 27601
                          (919) 856-4500
15
     For the Defendant:  Federal Public Defender
16                        By: Joseph H. Craven
                          150 Fayetteville St., Suite 450
17                        Raleigh, NC 27611-5967
                          (919) 856-4236
18
     Court Reporter:      Tracy L. McGurk, RMR, CRR
19                        413 Middle St.
                          New Bern, NC 28560
20                        (419) 392-6626

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by notereading.

24

25
```

```
 1                      I N D E X

 2

 3    Examinations                          Page

 4

 5       BRIANNA GROVER, Ph.D., DIRECT EXAMINATION    7

 6       BY MS. PETRE:

 7       BRIANNA GROVER, Ph.D., CROSS-EXAMINATION     34

 8       BY MR. CRAVEN:

 9

10                      E X H I B I T S

11    No.          Description                  Page

12

13    Whereupon Exhibits at Docket Entries 3, 8,     6

14    17, and 25 are admitted into evidence

15

16                      - - -

17

18

19

20

21

22

23

24

25
```

1       (Commenced at 10:01 a.m.)

2       THE COURT:  Good morning.

00:00:03  3       MS. PETRE:  Good morning, Your Honor.

00:00:05  4       THE COURT:  I call the case of United States

00:00:09  5  of America versus Todd Giffen.   And the matter comes

00:00:12  6  before this Court for determination of whether Mr.

00:00:17  7  Giffen meets criteria for civil commitment under 18,

00:00:25  8  United States Code, Section 4246.   Before I go any

00:00:27  9  further, I'd like to confirm that those participating by

00:00:32  10  video, which include Mr. Craven -- good morning, Mr.

00:00:37  11  Craven -- and Petitioner's expert and, of course, Mr.

00:00:42  12  Giffen, that you can all hear me.

00:00:46  13       Mr. Craven, is the audio working well?

00:00:50  14       MR. CRAVEN:  It is, Your Honor.  And we can

00:00:52  15  also see the courtroom there in New Bern.  And we are

00:00:56  16  otherwise ready to proceed.  Thank you very much.

00:00:58  17       THE COURT:  Okay.  Very good.

00:01:01  18       And Ms. Petre is here, of course.

00:01:04  19       MS. PETRE:  Good morning, Your Honor.

00:01:05  20       THE COURT:  Good morning.

00:01:11  21       Would anyone like to make an opening

00:01:16  22  statement?

00:01:16  23       I'll start with the government.   Would you?

00:01:18  24       MS. PETRE:  No, Your Honor, the government

00:01:19  25  would not like to make an opening statement, but I do

00:01:23 1 have several stipulations I'd like to offer to the Court
00:01:26 2 at the appropriate time.
00:01:27 3          THE COURT:  I welcome hearing what they are.
00:01:28 4          MS. PETRE:  This morning the United States
00:01:30 5 will call the expert testimony of Dr. Brianna Grover.
00:01:34 6 The parties have stipulated she is an expert in the
00:01:36 7 field of forensic psychology.  So we would offer her to
00:01:39 8 the Court as such this morning.
00:01:41 9          We'd also agree to stipulate to the reports
00:01:44 10 that have been submitted in this case, that they are
00:01:46 11 expert reports for consideration by this Court.  That
00:01:50 12 would include the initial forensic note offered by the
00:01:54 13 risk panel at docket entry 2 [sic], the reports of Dr.
00:01:58 14 Brianna Grover at docket entry 8 and 25, and the report
00:02:02 15 of Dr. Hans Stelmach, the Court-appointed
00:02:06 16 respondent-selected independent examiner in this case
00:02:09 17 located at docket entry 17.
00:02:12 18          Finally, the parties have stipulated that
00:02:15 19 prong 1 is met in this case, meaning that the parties
00:02:19 20 agree that Mr. Todd Giffen suffers from a mental disease
00:02:23 21 or defect, specifically in this matter schizophrenia.
00:02:27 22 Thank you, Your Honor.
00:02:27 23          THE COURT:  Thank you, ma'am.
00:02:31 24          Would the respondent like to make any
00:02:33 25 opening statement?

00:02:35  1        MR. CRAVEN:  Your Honor, may it please the

00:02:42  2  Court, this is Joe Craven.  Ms. Petre is correct in the

00:02:46  3  stipulations that she offered.  Those are things we

00:02:49  4  agreed upon, and I thank you for accepting those.

00:02:51  5        I do not wish to make an opening statement.

00:02:56  6        THE RESPONDENT:  Your Honor, this is a

00:02:59  7  violation.  My attorney is refusing to follow my

00:03:02  8  objective, and he has no agency to speak on my behalf.

00:03:09  9        I'd like to talk about some issues before we

00:03:10  10  proceed.  For example, he just stipulated to facts that

00:03:13  11  I never stipulated to, and he's not allowed to do that

00:03:17  12  on my behalf.  He can't agree with the government.  It

00:03:23  13  is a violation where the attorney agrees with everything

00:03:26  14  the state says and has the effect of a prima facie case

00:03:31  15  where the principal or the accused automatically is

00:03:35  16  determined to be guilty without contesting the charges

00:03:38  17  or the issues.

00:03:41  18        So can I please make -- I need to make a

00:03:44  19  further statement on this issue, because I have a

00:03:47  20  three-page motion.  I need to read it to the Court.

00:03:50  21        THE COURT:  All right.  Mr. Giffen, let me

00:03:53  22  take the matters in order.  And I will certainly give

00:03:57  23  you the opportunity to be heard further.  I want to

00:04:03  24  address first the fact that the attorneys, who have the

00:04:08  25  legal knowledge to enter into stipulations, have

00:04:14 1  stipulated to entry of certain exhibits, reports at

00:04:20 2  docket entries number 2 [sic], 8, 17, and 25.  Let

00:04:26 3  those be received into evidence.

04:12:05 4              (Whereupon Exhibits at Docket Entries 3, 8,

04:12:07 5  17, and 25 are admitted into evidence.)

00:04:29 6              THE COURT:  Let the expert who has been

00:04:31 7  proposed also be so received.

00:04:35 8              And we will move forward now with the

00:04:42 9  understanding, Mr. Giffen, that you are represented by

00:04:47 10 Mr. Craven.  But I will certainly give you a chance to

00:04:50 11 be heard further.

00:04:51 12             When I give you that opportunity, I would

00:04:54 13 appreciate a microphone perhaps being pushed closer to

00:05:02 14 Mr. Giffen.

00:05:03 15             Thank you, Mr. Craven.

00:05:05 16             All right.  The burden here is born by the

00:05:09 17 United States of America.  So as is customary, we're

00:05:13 18 going to hear from the United States of America first.

00:05:20 19             And would you like to call your expert?

00:05:22 20             MS. PETRE:  Thank you, Your Honor.  Yes.

00:05:24 21 The United States would like to call Dr. Brianna Grover.

00:05:28 22             THE COURT:  Dr. Grover, would you please

00:05:31 23 raise your right hand.  The clerk is going to

00:05:34 24 administer the oath to you.

00:05:40 25             (Whereupon the witness was sworn by the

```
00:05:40   1    clerk.)

00:05:54   2                         - - -

00:05:54   3         BRIANNA GROVER, Ph.D., DIRECT EXAMINATION

00:05:55   4    BY MS. PETRE:

00:05:55   5    Q.  Good morning, Dr. Grover.  I'm going to ask you

00:06:03   6    initially just as a procedural matter just to speak nice

00:06:07   7    and loud for the Court.  We're in a lovely but very

00:06:10   8    large courtroom, and so we do get a little bit of echo

00:06:13   9    and feedback.  So please speak nice and loudly.

00:06:19   10        It appears there's a bit of a lag.  I will try

00:06:22   11   not to interrupt you and ask that you give it a minute

00:06:25   12   and try to do the same here.

00:06:30   13   A.  Sure.   Thank you.

00:06:32   14   Q.  Could you please explain to the Court how you

00:06:34   15   came to evaluate Mr. Giffen in this case.

00:06:36   16   A.  Yes.   Mr. Giffen was initially charged with

00:06:44   17   federal offenses in 2018.   Those offenses were for

00:06:50   18   threats via interstate communication and stalking in the

00:06:53   19   district of Oregon.

00:06:56   20        He was initially set for a competency evaluation

00:07:01   21   in 2019, and he underwent several competency evaluations

00:07:06   22   that found him not competent to stand trial.

00:07:12   23        In October of 2019, Mr. Giffen arrived at FMC

00:07:18   24   Butner for one of those competency evaluations, and he

00:07:20   25   was assigned to another psychologist at that time for
```

| | | |
|---|---|---|
| 00:07:24 | 1 | the evaluation.  And ultimately that psychologist |
| 00:07:28 | 2 | requested the Court to make a determination regarding |
| 00:07:32 | 3 | involuntary medication via Sell given Mr. Giffen's |
| 00:07:38 | 4 | continued mental health symptoms and his unwillingness |
| 00:07:42 | 5 | to consent to psychiatric medication at the time. |
| 00:07:45 | 6 | Ultimately that court granted the Sell request in |
| 00:07:51 | 7 | January of 2021. |
| 00:07:52 | 8 | However, shortly after that Mr. Giffen's defense |
| 00:07:56 | 9 | attorney on the criminal case appealed that ruling, and |
| 00:08:01 | 10 | it came back on December 28th of 2021 that he was not |
| 00:08:08 | 11 | competent and not restorable.  And following that |
| 00:08:12 | 12 | ruling I was assigned to complete a 4246 evaluation on |
| 00:08:16 | 13 | Mr. Giffen. |
| 00:08:19 | 14 | Q.  You mentioned that the charges that brought Mr. |
| 00:08:21 | 15 | Giffen into federal custody were threats via interstate |
| 00:08:24 | 16 | communication and stalking.  Could you, if you're |
| 00:08:28 | 17 | aware, please describe the circumstances that led to |
| 00:08:31 | 18 | those charges? |
| 00:08:33 | 19 | A.  Yes.  It's my understanding from reading the |
| 00:08:38 | 20 | criminal investigation report that from July through |
| 00:08:41 | 21 | September of 2018, Mr. Giffen sent approximately 20 |
| 00:08:49 | 22 | communications via Facebook messenger.  These |
| 00:08:52 | 23 | communications included statements such as "I'm going to |
| 00:08:55 | 24 | rape you and your staff for abusing a vulnerable person |
| 00:09:01 | 25 | in your career." |

00:09:02   1          By October of 2018 he had continued engaging in

00:09:06   2     these types of quotes and made a quote such as "Go ahead

00:09:10   3     and violate my rights as long as you can.  I'm going to

00:09:14   4     kill you."

00:09:14   5          While the investigative materials were redacted,

00:09:19   6     in speaking with Mr. Giffen's grandmother, it appears

00:09:23   7     that these statements were made to Congressman Peter

00:09:26   8     DeFazio, and he was considered a victim in that case, as

00:09:30   9     well as the staff member that worked for him.  And the

00:09:36  10     chief of staff had requested police presence at all

00:09:39  11     public gatherings in which Peter DeFazio was going to be

00:09:43  12     present.

00:09:46  13     Q.  During the course of your evaluation have you had

00:09:49  14     the opportunity to assess Mr. Giffen's present mental

00:09:54  15     condition?

00:09:54  16     A.  Yes, I have.

00:09:56  17     Q.  And did you render a diagnosis in this case?

00:10:02  18     A.  Yes, I did.   I diagnosed Mr. Giffen with

00:10:05  19     schizophrenia.

00:10:06  20     Q.  And what symptoms or behaviors on the part of Mr.

00:10:10  21     Giffen led you to this diagnosis?

00:10:12  22     A.  In review of the collateral record, it appears

00:10:18  23     that Mr. Giffen has been suffering from symptoms of

00:10:21  24     schizophrenia since at least 2004 when he was first

00:10:25  25     hospitalized at Oregon State Hospital.

00:10:30 1      While he's been here at FMC Butner, he has

00:10:34 2  repeatedly discussed governmental conspiracies and

00:10:38 3  believes that FMC Butner is a CIA facility and that he

00:10:43 4  has been sent here to be tortured and murdered by the

00:10:49 5  government.   Additionally, he has expressed beliefs

00:10:52 6  that it's possible he was sent to this facility as an

00:10:59 7  undercover individual to expose this being a secret CIA

00:11:05 8  facility.   These types of beliefs are considered to be

00:11:08 9  persecutory and delusional in which he believes that

00:11:12 10  other people are out to get him or harm him.

00:11:15 11      Additionally, when he exhibits these types of

00:11:18 12  symptoms, he often engages in disorganized speech that

00:11:21 13  is hard to follow.

00:11:22 14      And at other times when he is not agitated he has

00:11:25 15  evidenced what we call a negative affect, in which he is

00:11:29 16  very much withdrawn and flat in his presentation to

00:11:33 17  staff.

00:11:36 18  Q.  How have the symptoms of Mr. Giffen's mental

00:11:40 19  condition impacted his daily functioning?

00:11:48 20  A.  Since I met Mr. Giffen, he has --

00:11:55 21          THE COURT:  I must stop you for a moment

00:11:58 22  because the quality of the audio has suddenly become

00:12:01 23  very poor.   I would like our IT person to return to the

00:12:07 24  room and just see if it can be improved.

00:12:11 25          And while we wait for Andrew, if everyone

00:12:13  1  would just pause.  I do want to ask the court reporter

00:12:17  2  a question that she doesn't need to type.

00:12:36  3              (Discussion had off the record.)

00:12:37  4              THE COURT:  Andrew is  on his way back to

00:12:39  5  the room.  Thank you for your patience.

00:12:41  6              It may be that we just can't improve this,

00:12:44  7  but we're going to try.

00:12:44  8              (A pause in the proceedings.)

00:14:32  9              THE COURT:  We're still waiting for IT help.

00:14:41 10              Just to clarify, what the government offered

00:14:45 11  as docket entry number 2 is docket entry number 3,

00:14:49 12  right?

00:14:50 13              MS. PETRE:  My apologies, Your Honor.

00:14:57 14              THE COURT:  You can let me know if you think

00:14:59 15  the clerk's counting is in error.  We'll go with that

00:15:02 16  unless I hear further.

00:15:04 17              Why don't you repeat your last question to

00:15:07 18  the expert.  Let's just see how it goes.

00:15:10 19              MS. PETRE:  Thank you, Your Honor.

00:15:10 20  BY MS. PETRE:

00:15:11 21     Q.  Dr. Grover, before we paused I asked: How, if at

00:15:16 22  all, have the symptoms of Mr. Giffen's mental illness or

00:15:19 23  mental condition impacted his daily functioning?

00:15:28 24     A.  Since January of 2022, Mr. Giffen has resided on

00:15:34 25  our secure mental health unit after he threatened staff,

00:15:39 1  threatened to kill two different staff members on that

00:15:42 2  date.  And since that time he has continued to present

00:15:46 3  with a decompensation of his mental health resulting in

00:15:51 4  him threatening staff members and continuing to require

00:15:54 5  placement on our secure mental health unit.

00:16:00 6          MS. PETRE:  Your Honor, may I proceed?

00:16:00 7          THE COURT:  Yes.

00:16:02 8          MS. PETRE:  Thank you.

00:16:04 9  BY MS. PETRE:

00:16:05 10     Q.  I noticed in your report, Dr. Grover, that you

00:16:07 11 identify Mr. Giffen's schizophrenia as continuous in

00:16:12 12 nature.  Can you explain what that means?

00:16:16 13     A.  Sure.  What that means is that he has had those

00:16:23 14 symptoms for a consistent period of time, and those

00:16:27 15 symptoms have not remitted during that period of time.

00:16:32 16 There are times in the past in which he has evidenced

00:16:37 17 periods of improved symptoms with antipsychotic

00:16:41 18 medication and ultimately been found competent to stand

00:16:45 19 trial.  But most recently, at least since his arrest in

00:16:49 20 2018, he has not taken any antipsychotic medications,

00:16:53 21 and his symptoms have persisted.

00:16:57 22     Q.  You noted earlier that the earliest history of

00:17:00 23 hospitalization at Oregon State Hospital was in 2004.

00:17:06 24 Were there hospitalizations that came after that initial

00:17:10 25 hospitalization period?

00:17:13　1　　A.　Yes, there were.

00:17:16　2　　Q.　Approximately how many?

00:17:20　3　　A.　In a review of the record it looks like Mr.

00:17:24　4　Giffen was inpatiently hospitalized on eight occasions

00:17:29　5　from 2004 to 2013 at Oregon State Hospital.

00:17:34　6　Additionally he was briefly hospitalized at least three

00:17:37　7　additional times at another facility.

00:17:41　8　　Q.　During or following those periods of

00:17:45　9　hospitalization, were you able to determine from the

00:17:47　10　records whether Mr. Giffen had ever been prescribed

00:17:51　11　medications to take in the community?

00:17:55　12　　A.　Yes, it appears that he was prescribed

00:17:58　13　antipsychotic medications to take in the community.

00:18:01　14　　Q.　And based on those records, were you able to

00:18:04　15　determine Mr. Giffen's level of compliance with those

00:18:08　16　medications in the community?

00:18:12　17　　A.　Yes.　The records indicate that oftentimes when

00:18:15　18　Mr. Giffen was released from custody he would stop

00:18:18　19　taking those medications and thus would decompensate in

00:18:23　20　his mental health symptoms.

00:18:25　21　　Q.　You noted for the record that Mr. Giffen is not

00:18:27　22　presently taking any antipsychotic medication, but are

00:18:31　23　you aware of whether or not his treatment team has

00:18:34　24　recommended a course of treatment for his schizophrenia?

00:18:39　25　　A.　Yes, at this time the treatment team does

00:18:42  1  recommend, of course, antipsychotic medication to treat

00:18:45  2  him.  The psychiatry providers routinely inquire

00:18:51  3  whether or not he is interested in taking medication,

00:18:53  4  and he has consistently denied those requests to

00:18:57  5  consider antipsychotic medication.

00:18:59  6      Q.  Has Mr. Giffen provided staff with a reasoning or

00:19:03  7  a rationale as to why he is not interested in taking the

00:19:08  8  medication recommended to him?

00:19:10  9      A.  Yes.  Mr. Giffen has explained on numerous

00:19:14  10  occasions his belief that when taking antipsychotic

00:19:17  11  medications previously at Oregon State Hospital it

00:19:21  12  created brain damage to him, and he believes that

00:19:24  13  antipsychotic medications are used to potentially kill

00:19:31  14  people when they are treated with them.

00:19:35  15      Q.  Is there any evidence in the record that Mr.

00:19:38  16  Giffen suffered any brain damage or related symptoms

00:19:42  17  while at Oregon State Hospital?

00:19:44  18      A.  No.  And, in fact, there are records from Oregon

00:19:50  19  State Hospital that once he was treated and compliant

00:19:52  20  with medications at one point, he underwent in depth

00:19:58  21  medical assessments, and no damage was found or noted.

00:20:01  22      Q.  I see in your report that you also diagnosed Mr.

00:20:05  23  Giffen with borderline personality disorder.  Could you

00:20:09  24  explain that diagnosis?

00:20:12  25      A.  Yes.  I left the borderline personality disorder

00:20:17  1   by history, and the reason I did that is because this

00:20:22  2   diagnosis is one in which an individual experiences

00:20:25  3   pervasive difficulties in their relationships with

00:20:28  4   others as well as with their affect and their emotions.

00:20:33  5   And the symptoms include things like impulsivity,

00:20:38  6   suicidal ideation, engaging in agitation or angry

00:20:46  7   outbursts at other people.  And these symptoms are

00:20:49  8   similar to those of schizophrenia.  And so I left that

00:20:56  9   per history because given the time I have known Mr.

00:21:01  10  Giffen, he has not been prescribed antipsychotic

00:21:03  11  medication, and these symptoms could be better accounted

00:21:06  12  for by a schizophrenia diagnosis alone.  However, given

00:21:10  13  that he has had this diagnosis on the record since

00:21:14  14  approximately 2013, I left it per history until he is

00:21:19  15  treated with antipsychotic medication, when it can be

00:21:22  16  better determined whether the symptoms continue or

00:21:25  17  persist with the medication, which would be more

00:21:29  18  indicative that it is a borderline personality disorder

00:21:34  19  versus schizophrenia alone.

00:21:42  20     Q.  How would you characterize Mr. Giffen's

00:21:45  21  adjustment to life at the Medical Center in Butner?

00:21:51  22     A.   I would characterize Mr. Giffen as there have

00:21:55  23  been times where he has stayed on the open mental health

00:22:01  24  unit for periods of time; however, while he was on the

00:22:06  25  open mental health unit, he is often isolative and stays

00:22:10 1  in his room for the majority of the time.

00:22:16 2      What has happened that has led to his secure

00:22:20 3  housing on a few different occasions is when he has been

00:22:22 4  confronted by staff to comply with routine rules; for

00:22:29 5  example, on one occasion an officer approached him in

00:22:33 6  order to engage in a cell search, which is routinely

00:22:36 7  done here at FMC Butner and is required by the officers

00:22:40 8  to engage in on a routine basis.  Mr. Giffen responded

00:22:44 9  to the officer's request in a hostile manner, did not

00:22:48 10 want the officer to search his room, stated the officer

00:22:51 11 did not have the authority and could not search his

00:22:55 12 room, and then ultimately threatened to kill the

00:22:59 13 officer.  That incident resulted in Mr. Giffen being

00:23:02 14 placed in our secure housing unit.

00:23:05 15      Once Mr. Giffen is placed in secure housing, he

00:23:08 16 typically adjusts very poorly to placement in secure

00:23:12 17 housing.  He does not do well in secure housing.  He

00:23:15 18 often continues to threaten others while he is in secure

00:23:20 19 housing, which makes it very difficult to get him back

00:23:23 20 out to the open mental health unit, where he does do a

00:23:26 21 little bit better.

00:23:29 22 Q.  You mentioned an incident where he threatened an

00:23:32 23 officer or a staff member at the Medical Center.  Has

00:23:36 24 Mr. Giffen received any incident reports during the

00:23:39 25 course of his time at Butner?

00:23:43    1    A.   Yes, he has.

00:23:47    2    Q.   Could you describe those incident reports for me?

00:23:50    3    A.   Sure.  Mr. Giffen has received four incident

00:23:57    4    reports for threatening bodily harm.  Two of those were

00:24:01    5    in 2021, and two of them were this year in 2022.  As I

00:24:07    6    mentioned earlier, the first incident occurred in March

00:24:11    7    of 2021 where the officer was attempting to search his

00:24:15    8    cell.  He made statements including, "You can't search

00:24:18    9    my cell," "You can't take my stuff you dumb

00:24:22   10    motherfucker," and, "I will K.O. your faggot ass."

00:24:26   11    That incident led to him being placed in a secure mental

00:24:29   12    health unit.

00:24:29   13         Very shortly after that in April of 2021 when the

00:24:33   14    lieutenant was engaging with him, he made statements

00:24:36   15    such as, "You're all dead, motherfucker," "Someone is

00:24:40   16    going to need to shake his ass," and continued to engage

00:24:43   17    in expletive words towards the staff member.

00:24:51   18         In 2022 one of those incidents he actually

00:24:54   19    threatened two different staff members on the same day.

00:24:59   20    When a psychologist was attempting to interview him

00:25:03   21    regarding a sexual abuse allegation he had made against

00:25:09   22    staff, he told her, "Fuck you, bitch.  You have CIA

00:25:13   23    training and will cover for everyone," "you've been

00:25:16   24    beating and raping me," "fuck you," "I will kill you."

00:25:19   25         He further told the lieutenant that day when he

00:25:22 1  was placed in restraints, he attempted to lunge out of

00:25:27 2  the restraint chair and yelled, "I will kill all of

00:25:30 3  you." He continued to use expletive language during

00:25:33 4  that incident as well. He was emergently medicated on

00:25:37 5  that account.

00:25:38 6  In addition he has received incident reports for

00:25:42 7  refusing to obey an order, mail abuse, being in an

00:25:50 8  unauthorized area, being insolent towards staff on

00:25:53 9  several occasions. And there have been other incidents

00:25:56 10  in which he has made threatening statements to staff in

00:25:58 11  which he has not received incident reports for but has

00:26:01 12  been documented in his clinical record.

00:26:04 13  Q. Would one of those incidents have occurred when

00:26:08 14  he threatened one of the associate wardens at the

00:26:11 15  Medical Center?

00:26:13 16  A. Yes. That incident occurred in March of 2022.

00:26:19 17  Earlier that day Mr. Giffen had received an incident

00:26:23 18  report for phone abuse in which he had called his -- one

00:26:28 19  of his grandparents on the telephone and requested that

00:26:31 20  his grandparent three-way call his prior attorney. The

00:26:37 21  grandparent did attempt a three-way call which the

00:26:41 22  attorney did not answer. However, making three-way

00:26:44 23  calls is against institutional rules, so he received an

00:26:47 24  incident report for that.

00:26:49 25  Later that day when the associate warden was

00:26:51 1  making routine housing unit rounds on the secure mental

00:26:55 2  health unit, he engaged in a litany of complaints

00:26:59 3  towards her regarding his alleged abuse and torture that

00:27:04 4  he feels he has been undergoing since being at FMC

00:27:08 5  Butner.  When she attempted to encourage him to work

00:27:11 6  with his treatment provider and comply with treatment

00:27:14 7  recommendations, he responded by saying, "Fuck you,

00:27:19 8  motherfucker.  I'm going to wrap a phone cord around

00:27:22 9  your neck.  I will put a bullet in your brain."

00:27:28 10  Q.  Are these incidents that you've described the

00:27:32 11  only incidents of verbally aggressive or abusive

00:27:37 12  behavior that Mr. Giffen has exhibited while at the

00:27:40 13  Medical Center?

00:27:42 14  A.  No.  These are not the only incidents.  As I

00:27:46 15  mentioned, he has engaged in hostile and verbally

00:27:49 16  aggressive behavior on a fairly regular basis, and he

00:27:53 17  has not received incident reports for all of those

00:27:57 18  verbally aggressive incidents.  However, many more have

00:28:00 19  been documented in his clinical record.

00:28:05 20  Q.  Where is Mr. Giffen currently residing within the

00:28:09 21  mental health unit?

00:28:11 22  A.  He resides in 1E, which is our secure mental

00:28:16 23  health unit in which he is in a cell by himself.

00:28:22 24  Q.  Does Mr. Giffen on that unit have the opportunity

00:28:25 25  to attend any groups or to receive any treatment?

00:28:29 1    A.   Yes, he does.   On our secure mental health unit

00:28:33 2    right now there are various groups that are offered.

00:28:37 3    One of the most regular groups that we have encouraged

00:28:42 4    Mr. Giffen to attend is the Illness Management and

00:28:46 5    Recovery Group, which is offered by one of our treatment

00:28:49 6    providers.   Mr. Giffen initially expressed willingness

00:28:52 7    to attend this group.   However, he has been invited to

00:28:56 8    this group since at least June of 2022, and he has

00:29:00 9    declined every single session of the group, and most

00:29:04 10   recently stated, "I will die before I attend that

00:29:07 11   group."

00:29:09 12   Q.   Has Mr. Giffen attended any of the groups that

00:29:12 13   have been offered to him?

00:29:15 14   A.   No, he has not attended any.   And, in fact, most

00:29:18 15   recently he will not even leave his cell to attend

00:29:22 16   recreation, to shower, to meet with staff members

00:29:27 17   outside of his cell.   He expresses that he has too much

00:29:31 18   anxiety to leave his cell.

00:29:36 19   Q.   I'd like to move now to your risk assessment of

00:29:39 20   Mr. Giffen.   Did you utilize any tools or structured

00:29:43 21   judgment modules in order to assess Mr. Giffen's risk

00:29:47 22   moving forward?

00:29:49 23   A.   Yes, I did.   I used HCR-20, Version 3.

00:29:54 24   Q.   And what factors specifically does that

00:29:56 25   assessment look at in order to help guide your

00:29:59 1  assessment of his risk?

00:30:02 2     A.  That assessment looked at three major categories

00:30:06 3  of factors, including historical risk factors, which are

00:30:12 4  static factors that generally do not change over time;

00:30:15 5  it looked at clinical risk factors which focus on how a

00:30:21 6  person is doing clinically, and these can be dynamic and

00:30:24 7  change over time based on the treatment an individual is

00:30:27 8  receiving; and then it also looks at risk management

00:30:31 9  factors which focus on an individual's plan for release

00:30:35 10 and whether or not those plans are suitable to meet

00:30:39 11 their needs, their mental health needs in the community.

00:30:44 12    Q.  Let's start by talking about the historical

00:30:46 13 factors in this case.   Which factors did you find to be

00:30:52 14 most relevant in your analysis of Mr. Giffen's risk?

00:30:56 15    A.  The most relevant factors that I looked at were

00:31:00 16 Mr. Giffen's history of violence, his mental health

00:31:04 17 disorder -- major mental health disorder, as well as his

00:31:08 18 treatment and supervision response.

00:31:11 19    Q.  Let's start by talking about his history of

00:31:13 20 violence.   What information were you able to find in

00:31:16 21 the collateral sources that indicated that Mr. Giffen

00:31:21 22 has a history of engaging in violent behavior?

00:31:25 23    A.  In reviewing the collateral records, it looks

00:31:31 24 like his first act of violence occurred in 2004 in which

00:31:34 25 he was charged with menacing, harassment, and unlawful

| | | |
|---|---|---|
| 00:31:38 | 1 | use of a weapon after he threatened his grandmother with |
| 00:31:42 | 2 | a 13-inch knife stating, "It's time for you to die." |
| 00:31:45 | 3 | He was arrested and received competency restoration for |
| 00:31:50 | 4 | that offense and was ultimately adjudicated guilty |
| 00:31:55 | 5 | except for insanity. |
| 00:31:59 | 6 | At some point following that Mr. Giffen was again |
| 00:32:02 | 7 | hospitalized at the state psychiatric hospital, and |
| 00:32:06 | 8 | records indicate that from June of 2008 to January of |
| 00:32:11 | 9 | 2009 he had at least 15 documented episodes of assault |
| 00:32:16 | 10 | which were mostly towards staff members at the hospital. |
| 00:32:22 | 11 | These assaults resulted in some of the staff members |
| 00:32:25 | 12 | requiring treatment for being punched, eye gouges, and |
| 00:32:30 | 13 | scratches.  And he additionally engaged in property |
| 00:32:33 | 14 | damage including punching holes in the wall at the |
| 00:32:36 | 15 | hospital during this time. |
| 00:32:39 | 16 | During this hospitalization time he required |
| 00:32:44 | 17 | restraints and was involuntarily medicated after these |
| 00:32:49 | 18 | incidents. |
| 00:32:50 | 19 | At some point he was released from the hospital, |
| 00:32:52 | 20 | and in 2011 he was again arrested for various charges, |
| 00:32:59 | 21 | including assault.  And in reading the investigative |
| 00:33:04 | 22 | documents, it appears that Mr. Giffen assaulted his |
| 00:33:07 | 23 | grandfather by forcibly opening a door, putting a hole |
| 00:33:11 | 24 | in the wall, and then pushed his grandfather over in a |
| 00:33:15 | 25 | chair.  The police were called as a result of this |

00:33:18  1  incident, and when the police arrived, he resisted

00:33:21  2  arrest and punched one officer and then gouged the eye

00:33:26  3  of another officer.

00:33:29  4      Additionally he reportedly attempted to get an

00:33:32  5  officer's handgun that was on his waist and only

00:33:35  6  released his grip on another officer's face when he was

00:33:39  7  threatened with being tased.

00:33:43  8      He was evaluated at the jail and again placed in

00:33:45  9  a psychiatric hospital at that time, and in March of

00:33:50  10  2012, just before his discharge from the hospital, he

00:33:54  11  wrote his psychiatrist a threatening letter.

00:33:59  12      Mr. Giffen was again charged with assault in 2013

00:34:06  13  after he reportedly punched his grandfather while they

00:34:09  14  were driving in a truck together because he believed his

00:34:11  15  grandfather was spying on him for the Central

00:34:15  16  Intelligence Agency, the CIA.

00:34:19  17      And finally, we've already discussed the instant

00:34:25  18  offense in which he was messaging threatening messages

00:34:28  19  to Congressman DeFazio, as well as his behavior while

00:34:32  20  he's been here at FMC Butner.

00:34:34  21  Q.  You mentioned on a few occasions that Mr.

00:34:37  22  Giffen's conduct was directed towards his grandmother

00:34:42  23  and his grandfather.  To your knowledge was he residing

00:34:47  24  with these individuals during that time?

00:34:53  25  A.  It is my understanding he was residing with his

| | |
|---|---|
| 00:34:56 | 1 |
| 00:35:00 | 2 |
| 00:35:04 | 3 |
| 00:35:08 | 4 |
| 00:35:12 | 5 |
| 00:35:18 | 6 |
| 00:35:24 | 7 |
| 00:35:28 | 8 |
| 00:35:31 | 9 |
| 00:35:34 | 10 |
| 00:35:39 | 11 |
| 00:35:41 | 12 |
| 00:35:46 | 13 |
| 00:35:50 | 14 |
| 00:35:53 | 15 |
| 00:35:57 | 16 |
| 00:36:01 | 17 |
| 00:36:03 | 18 |
| 00:36:07 | 19 |
| 00:36:10 | 20 |
| 00:36:14 | 21 |
| 00:36:15 | 22 |
| 00:36:18 | 23 |
| 00:36:22 | 24 |
| 00:36:26 | 25 |

grandparents during these assaults.

Q. You also cited the historical issue of Mr. Giffen's major mental disorder as one of the risk factors in this case. How, if at all, does his diagnosis factor in as a risk factor?

A. Well, as mentioned, Mr. Giffen has suffered a mental illness since a young age, but at least -- he has being diagnosed consistently with schizophrenia and demonstrating symptoms of schizophrenia since at least 2004. This represents a risk factor for Mr. Giffen because what we know is that the longer somebody is diagnosed with a psychotic disorder such as schizophrenia and goes untreated, the more likely -- the more difficult it is to treat them in the future. Schizophrenia is a lifelong condition in which Mr. Giffen will continue to suffer from throughout the remainder of his lifetime.

Q. And finally, you cited one of the most salient factors as being his treatment and supervision response. Can you tell us a little bit about how that historical factor plays in?

A. Sure. Records indicate that there have been times where Mr. Giffen has been restored to competency with antipsychotic medication. That indicates that with the treatment of antipsychotic medications, his

| | |
|---|---|
| 00:36:29 | 1 |

symptoms have remitted enough to be competent and

participate in the court proceedings.   However, as

discussed earlier, when released from the hospital, he

would often discontinue his medication, which would

result in psychiatric decompensation and require

placement at the state psychiatric hospital again.

     Additionally, there are records that at least on

one occasion he violated the terms of his conditional

release from the hospital due to not liking the group

home that he was placed at.

Q.   I'd like to move now to the clinical factors in

this case.   Could you explain which factors you found

to be present for Mr. Giffen?

A.   Sure.   Currently present are Mr. Giffen has

evidenced problems with insight, problems with

instability, symptoms of major mental disorder, and

problems with treatment and supervision response.

Q.   And let's start by talking about Mr. Giffen's

insight.   Now, this factor is more than just an

understanding that he has a mental illness; is that

right?

A.   Yes, that is right.   In addition to an individual

having understanding about their mental illness, this

factor also takes into account the individual's

understanding and insight into their need for treatment

00:38:02 1 and their risk of violence towards others.

00:38:05 2    Q.  And could you describe how you assessed Mr.

00:38:11 3 Giffen's insight?

00:38:13 4    A.  Sure.  In talking with Mr. Giffen, he denies

00:38:19 5 being diagnosed with a mental illness.  However, he

00:38:24 6 does routinely discuss his belief that he has brain

00:38:26 7 damage and delirium as well as PTSD symptoms from

00:38:35 8 previous treatment with antipsychotic medications.

00:38:37 9 That leads to his refusal to engage in mental health

00:38:42 10 treatment, including psychiatric medications, because he

00:38:46 11 believes the medications have killed people.

00:38:49 12      In addition he does not evidence an understanding

00:38:52 13 of his risk of violence towards others.  When routinely

00:38:58 14 asked about his behavior in which he has threatened

00:39:01 15 staff, a day or two after the fact Mr. Giffen minimizes

00:39:06 16 his behaviors and has made statements such as "During

00:39:10 17 incidents of torture and isolation I can threaten to

00:39:14 18 kill people because y'all are using violence and then

00:39:17 19 just quoting what I'm saying."  This lack of

00:39:21 20 understanding that, you know, threatening to kill people

00:39:22 21 is very serious, and it is taken very seriously when he

00:39:27 22 does this.  And he minimizes his behavior greatly and

00:39:31 23 blames staff for keeping him in isolation.

00:39:36 24    Q.  One of the factors that I think you've touched

00:39:40 25 upon a little bit, but I'd like to hear more about, is

00:39:42  1   Mr. Giffen's instability.   Could you tell us about

00:39:44  2   that?

00:39:45  3       A.   Sure.   When I took over Mr. Giffen's case, Mr.

00:39:51  4   Giffen was on an open mental health unit.   However, in

00:39:55  5   March of 2021 was the first time that I took over his

00:39:59  6   case that he required placement in the secure mental

00:40:01  7   health unit.   He remained in the secure mental health

00:40:05  8   unit due to his continued threatening and destructive

00:40:10  9   behavior I believe until May of 2021.   At that point,

00:40:14 10   again, he remained on the open mental health unit until

00:40:17 11   January of 2022, which he -- as I mentioned earlier, he

00:40:23 12   remained there at this time due to his agitated behavior

00:40:27 13   towards staff and his continued threats towards staff.

00:40:35 14       Q.   What steps would need to be taken in order to

00:40:39 15   work with Mr. Giffen to transition to a less restrictive

00:40:43 16   mental health unit?

00:40:44 17       A.   Yes, we have been working with Mr. Giffen and

00:40:49 18   trying to work with him on this, given his request to

00:40:51 19   move and return to an open mental health unit at times.

00:40:55 20   The steps that we would want to see is first that Mr.

00:40:59 21   Giffen leave his cell to participate in recreation

00:41:03 22   opportunities available to him as well as the group

00:41:06 23   treatment opportunities available to him.   These

00:41:09 24   periods of time leaving his cell, walking from his cell

00:41:13 25   to the area in which recreation and group treatment

00:41:18   1   occur would allow him to evidence that he can maintain

00:41:21   2   appropriate behavior and not engage in threatening

00:41:24   3   behaviors toward staff.

00:41:27   4        We would also really encourage and like to see

00:41:30   5   Mr. Giffen consider psychiatric medication prior to

00:41:35   6   leaving secure housing.

00:41:37   7        Once he could engage in appropriate behaviors

00:41:39   8   such as going to recreation and attending group, the

00:41:43   9   next step would likely be to offer him escorted passes

00:41:47 10   to our open mental health unit where he could go to the

00:41:51 11   open mental health unit for a period of time.  And,

00:41:54 12   again, if he engaged in appropriate behavior during

00:41:57 13   those passes, we could consider him for a gradual

00:42:01 14   release plan on our open mental health unit or decide

00:42:04 15   that he was appropriate to be on the open mental health

00:42:07 16   unit full-time.

00:42:08 17   Q.  And have these opportunities been presented to

00:42:12 18   Mr. Giffen such that he understands that this is what it

00:42:14 19   would take for him to transition back to a less

00:42:17 20   restrictive unit?

00:42:19 21   A.  I have attempted to explain to Mr. Giffen on

00:42:24 22   many, many occasions.  Whether or not he fully

00:42:27 23   understands that, I don't totally believe that he does.

00:42:34 24   He continues to express anxiety about leaving the open

00:42:37 25   mental health unit while also requesting to be on the

00:42:40  1  open mental health unit.  So I don't know that he fully

00:42:43  2  understands the process, and that has been explained to

00:42:46  3  him numerous times.

00:42:47  4     Q.  You cited that his present clinical treatment and

00:42:52  5  supervision response is of concern to you.  Are there

00:42:56  6  other factors other than the ones you've just

00:42:59  7  highlighted for us that you'd like to talk about as it

00:43:02  8  relates to that risk factor?

00:43:04  9     A.  Yes.  I would like to just highlight that Mr.

00:43:10  10  Giffen has routinely requested treatment opportunities

00:43:14  11  at FMC Butner; however, when asking him further about

00:43:21  12  these treatment opportunities that he would like, he has

00:43:23  13  responded with things such as habilitation, housing,

00:43:28  14  money, whole body recreation, chiropractor, massage

00:43:33  15  therapy, hot tub, a tutor for English, learning a new

00:43:38  16  language, snow boarding, and trips to Europe and Japan,

00:43:43  17  as examples.  All of these are things that we are

00:43:46  18  unable to provide in terms of treatment opportunities.

00:43:49  19  And when explained to him the treatment opportunities

00:43:52  20  that we are able to offer him and that we think would be

00:43:54  21  effective for his mental illness, he is unwilling to

00:43:57  22  accept those.

00:43:59  23     Q.  And finally, you noted that his present symptoms

00:44:02  24  of a major mental disorder is also a risk factor.  Why

00:44:06  25  is that the case?

00:44:10  1   A.  Well, Mr. Giffen continues to have persecutory

00:44:13  2   delusions that other people, including those of us that

00:44:16  3   work here at the facility and in the government, are

00:44:19  4   trying to torture him and harm him.  Thus, those

00:44:23  5   beliefs are what lead him often to directly threaten to

00:44:28  6   kill staff here at this facility.

00:44:33  7   Q.  Moving now to the risk management factors, does

00:44:36  8   Mr. Giffen have a plan for what would happen if he were

00:44:40  9   to be released?

00:44:41  10  A.  It's not totally clear.  Mr. Giffen provided a

00:44:45  11  few different possibilities if he were to be released.

00:44:49  12  At one point he discussed moving to New York City

00:44:53  13  because he explained that they gave him a housing

00:44:56  14  voucher to pay rent.  It is unclear if that is

00:45:00  15  accurate.  However, he also discussed possibly

00:45:03  16  returning to Portland, Oregon; and he would either

00:45:07  17  reside in a homeless shelter or live with his

00:45:10  18  grandparents.

00:45:12  19  Q.  In your opinion are any of these potential

00:45:15  20  release plans appropriate for Mr. Giffen and his mental

00:45:22  21  health needs?

00:45:22  22  A.  It's my opinion that these are not appropriate

00:45:25  23  for Mr. Giffen.  I actually had the opportunity to

00:45:29  24  speak with Mr. Giffen's grandfather regarding this

00:45:32  25  possible release plan.  While Mr. Giffen's grandfather

00:45:38  1   stated that it would be up to his grandmother whether or

00:45:41  2   not he could reside with them, it's notable that Mr.

00:45:45  3   Giffen has assaulted both of his grandparents while

00:45:47  4   living with them in the past, and his grandfather does

00:45:51  5   not believe that Mr. Giffen has a mental illness.

00:45:56  6       Q.  Are there any other risk management factors that

00:45:59  7   you would like to highlight for the Court?

00:46:02  8       A.  I just would like to also note that Mr. Giffen's

00:46:06  9   personal support, outside of his grandparents, who do

00:46:11  10  seem to provide him with some support in maintaining

00:46:15  11  communication with him while he is here -- he does not

00:46:18  12  have a broad network that would be supportive of his

00:46:24  13  mental health needs.   He identified several individuals

00:46:26  14  that he wanted to connect with that included NSA

00:46:31  15  whistle-blowers and indicated that he wanted to have

00:46:35  16  these whistle-blowers help him get his story into *The*

00:46:38  17  *New York Times* in order to expose the torture that he's

00:46:42  18  been undergoing while he's been here at FMC Butner.

00:46:46  19      Q.  And just to clarify for the record, is there any

00:46:50  20  evidence that Mr. Giffen has been tortured or abused by

00:46:54  21  any staff members at the Medical Center in Butner during

00:46:58  22  the course of his treatment there?

00:47:00  23      A.  No, there has been no evidence of that.  And, in

00:47:03  24  fact, when he has made allegations of sexual abuse, we

00:47:06  25  followed the appropriate protocol to investigate those.

00:47:13  1    Q.  Are you able to find a nexus or a relationship

00:47:20  2  between Mr. Giffen's mental condition and his acts of

00:47:25  3  violence?

00:47:28  4    A.  Yes.  The nexus -- based on Mr. Giffen's

00:47:34  5  persecutory delusions that other people are out to harm

00:47:38  6  him or get him, that is when he has engaged in violent

00:47:42  7  behaviors towards others in an effort to protect

00:47:45  8  himself.

00:47:48  9    Q.  Are there any protective or mitigating factors in

00:47:51  10  the record that might lend themselves in Mr. Giffen's

00:47:56  11  favor?

00:47:58  12    A.  Mr. Giffen does have a major protective factor in

00:48:02  13  the fact that he does not have a history of using

00:48:06  14  illegal substances.  He has denied using such.  His

00:48:11  15  grandparents have confirmed that.  And there's no

00:48:13  16  indication in the record that he's used illegal

00:48:16  17  substances.

00:48:17  18       In addition, most of his criminal offenses appear

00:48:20  19  related to his mental illness and not such from

00:48:25  20  antisocial personality disorder or a general disregard

00:48:29  21  for the law.

00:48:32  22    Q.  I see in your report that after consideration of

00:48:34  23  all of the risk and protective factors encompassed in

00:48:38  24  the HCR-20 that you rated Mr. Giffen in the high risk

00:48:42  25  category for future of violence.  Could you just

00:48:46  1  summarize how you came to that categorization based on

00:48:50  2  the risk factors?

00:48:53  3      A.   Sure.   Currently, given Mr. Giffen's chronic

00:48:57  4  mental health symptoms as well as his refusal to engage

00:49:00  5  in any mental health treatment, he is at a high risk to

00:49:05  6  harm others without any kind of special controls in

00:49:07  7  place.

00:49:10  8      Q.   Are you aware of whether any attempts at state

00:49:13  9  placement have been made for Mr. Giffen?

00:49:16  10     A.   Yes, I am.

00:49:18  11     Q.   And what, if any, attempts have been made to

00:49:21  12  secure him as a state placement opportunity?

00:49:25  13     A.   It's my understanding that social work has

00:49:28  14  reached out to both the state of New York as well as the

00:49:31  15  state of Oregon in order to determine whether or not

00:49:34  16  they would take Mr. Giffen into their state hospital

00:49:37  17  system.   However, no response has been received yet.

00:49:42  18     Q.   Are there any other factors in Mr. Giffen's case

00:49:45  19  or in his risk assessment that you'd like to share with

00:49:48  20  the Court at this time?

00:49:50  21     A.   No, I think we've covered them all.

00:49:53  22     Q.   So, Dr. Grover, what is your ultimate opinion as

00:49:56  23  to whether or not Mr. Giffen meets criteria for

00:49:59  24  commitment today?

00:50:00  25     A.   It's my opinion that Mr. Giffen does meet

00:50:03  1    commitment criteria pursuant to 4246.

00:50:07  2                    MS. PETRE:  Thank you, Dr. Grover.

00:50:11  3                    Thank you, Your Honor.

00:50:12  4                    THE COURT:  Any questions from the

00:50:13  5    respondent's lawyer?

00:50:16  6                    MR. CRAVEN:  Yes, Your Honor, just a few,

00:50:18  7    please.

00:50:18  8                          - - -

00:50:18  9         BRIANNA GROVER, Ph.D., CROSS-EXAMINATION

00:50:19  10   BY MR. CRAVEN:

00:50:19  11        Q.  Dr. Grover, am I right in thinking that the

00:50:25  12   picture moving forward, recommendations for Mr. Giffen's

00:50:28  13   treatment are to take antipsychotic medication and to

00:50:35  14   also participate in the treatment programs that are

00:50:38  15   available here at Butner?

00:50:39  16        A.  Yes, that's correct.

00:50:41  17        Q.  And it sounds like from reviewing some of the

00:50:44  18   past records of this case, particularly from Oregon

00:50:50  19   State Hospital, that Mr. Giffen has responded well to

00:50:55  20   antipsychotic medication in the past?

00:50:57  21        A.  Yes, that's my understanding.

00:50:58  22        Q.  And that he's also participated in treatment

00:51:03  23   programs once he's become medicated?

00:51:05  24        A.  Yes.

00:51:06  25        Q.  I noticed in the records very concerning

00:51:13 1 information about how Mr. Giffen may have been abused or

00:51:16 2 traumatized as a young child.   I think some of that

00:51:21 3 included emotional abuse, but also starvation, being

00:51:26 4 placed in a basement, being forced to wear diapers and

00:51:31 5 being fed baby food, and things like that.   Where does

00:51:36 6 that fit into the overall, sort of, puzzle or picture of

00:51:40 7 Mr. Giffen?

00:51:41 8    A.  All those things that you mentioned have been

00:51:45 9 things that Mr. Giffen has reported regarding his

00:51:49 10 childhood.   It's unclear whether or not those have

00:51:52 11 actually occurred or they're part of his delusional

00:51:55 12 beliefs.   However, if he has undergone those, an

00:52:00 13 individual who's experienced traumatic things like that

00:52:03 14 is unlikely to trust other people and have difficulty

00:52:06 15 gaining that rapport with treatment providers, and that

00:52:10 16 is something they would continue to work on him to build

00:52:12 17 that rapport for him to be able to hopefully engage with

00:52:16 18 them in a positive manner.

00:52:20 19    Q.  I just have one other question.   I saw in the

00:52:23 20 records a mention about a 2015 evaluation that I believe

00:52:29 21 was done at the University of California Davis, and that

00:52:34 22 I think maybe a couple of doctors diagnosed Mr. Giffen,

00:52:38 23 one with chronic traumatic encephalopathy; I think it's

00:52:44 24 often referred to as CTE.   We hear a lot about it in the

00:52:49 25 football context, the head injury context.   And another

00:52:52 1 diagnosis of -- kind of similar -- of post-concussive

00:52:55 2 syndrome. How does that fit into your evaluation or

00:53:00 3 your opinion of Mr. Giffen?

00:53:03 4 A. It's my understanding that both of those were

00:53:06 5 conducted by medical providers. I think neurologists

00:53:10 6 conducted one of those, and I don't remember who -- the

00:53:13 7 type of medical provider did the other. It is possible

00:53:15 8 that those exist. However, I believe that it's also

00:53:19 9 possible that the symptoms that he was exhibiting are

00:53:22 10 better accounted for by the longstanding schizophrenia

00:53:25 11 diagnosis that he has had.

00:53:28 12 As mentioned earlier, Oregon State Hospital had

00:53:31 13 undergone numerous medical assessments of Mr. Giffen

00:53:34 14 that indicated that those were not -- that he was not --

00:53:39 15 had any medical illnesses that would account for his

00:53:42 16 symptoms or his traumatic complaints that he had

00:53:47 17 complained of. I don't believe I've had the

00:53:50 18 opportunity to fully review those evaluations in person,

00:53:53 19 so I don't know the full context of them other than he

00:53:56 20 was diagnosed with those at some point.

00:53:57 21 Q. Is it fair to say at this point the sort of

00:54:00 22 current thinking from you and Butner staff is that he

00:54:04 23 does not have an organic physical problem that's causing

00:54:10 24 his symptoms and that you believe the symptoms and the

00:54:15 25 delusion and the threats and that type of behavior is

| | | |
|---|---|---|
| 00:54:17 | 1 | better explained by the schizophrenia diagnosis? |
| 00:54:20 | 2 | A. Yes, that's correct. |
| 00:54:23 | 3 | MR. CRAVEN: That's all the questions I |
| 00:54:25 | 4 | have, Your Honor. Thank you. |
| 00:54:26 | 5 | THE COURT: Thank you, counsel. |
| 00:54:27 | 6 | Any redirect? |
| 00:54:28 | 7 | MS. PETRE: No, Your Honor. |
| 00:54:28 | 8 | And the government would rest at this time. |
| 00:54:30 | 9 | THE COURT: All right. We have heard fully |
| 00:54:32 | 10 | then from the government. |
| 00:54:34 | 11 | Does the respondent wish to present any |
| 00:54:37 | 12 | evidence? |
| 00:54:39 | 13 | MR. CRAVEN: Your Honor, as you know from |
| 00:54:42 | 14 | the docket and the record, we selected Dr. Hans Stelmach |
| 00:54:50 | 15 | as an examiner in this case. He performed an |
| 00:54:53 | 16 | evaluation; he wrote a report that's on the docket. We |
| 00:54:55 | 17 | do not ask him to be a witness today. So we are not |
| 00:55:00 | 18 | presenting any evidence. |
| 00:55:02 | 19 | THE COURT: So noted. Thank you, counsel. |
| 00:55:06 | 20 | Would the petitioner wish to make any |
| 00:55:08 | 21 | closing argument? |
| 00:55:12 | 22 | MS. PETRE: Just briefly, Your Honor. |
| 00:55:14 | 23 | THE RESPONDENT: I'd like to speak, Your |
| 00:55:17 | 24 | Honor. |
| 00:55:17 | 25 | THE COURT: Yes, sir. I'm certainly going |

00:55:20  1   to let you speak.

00:55:20  2           Let's hear from the petitioner, though.

00:55:23  3           MS. PETRE:  Thank you, Your Honor.

00:55:23  4           Both the evaluators in this case agree that

00:55:26  5   Mr. Giffen meets criteria both for a mental disease or

00:55:30  6   defect, but also for civil commitment in this matter.

00:55:34  7   Both the evaluators, Dr. Stelmach and Dr. Grover,

00:55:37  8   diagnosed Mr. Giffen with schizophrenia.  It's a

00:55:41  9   longstanding diagnosis for him dating back to at least

00:55:44  10  2004, though Dr. Grover noted that the records indicate

00:55:47  11  that he was experiencing perhaps some symptoms of mental

00:55:50  12  illness earlier than that and encountering problems in

00:55:53  13  school and in life.

00:55:54  14          Now, we've heard perhaps some testimony that

00:55:56  15  he might have had a very difficult upbringing.  And

00:56:01  16  that's certainly very concerning.  And we're hopeful

00:56:03  17  that if Mr. Giffen were to engage in treatment at the

00:56:06  18  Medical Center at Butner that we could offer treatment

00:56:09  19  both for his mental illness but also perhaps for the

00:56:13  20  trauma that he's undergone as a child and to help him

00:56:17  21  move forward and into building and rebuilding his life.

00:56:21  22          But based on the risk factors and the

00:56:23  23  testimony of Dr. Grover here today, I think there's

00:56:26  24  ample evidence in the record to show that Mr. Giffen's

00:56:28  25  release today would pose a substantial risk of bodily

00:56:33 1 injury to another person or damage to their property.

00:56:36 2 And, in fact, Mr. Giffen's history shows both of those

00:56:39 3 things: threatening others/harming others and harming

00:56:43 4 the property of others.

00:56:46 5 And so based on that evidence, Your Honor,

00:56:47 6 I'd ask you to commit Mr. Giffen to the custody of the

00:56:50 7 Attorney General so that he can receive the treatment

00:56:52 8 that he needs moving forward. Thank you.

00:56:55 9 THE COURT: Thank you, counsel.

00:56:58 10 Mr. Craven, I would like to hear from you in

00:57:02 11 closing argument, and also to confirm the opportunity

00:57:07 12 I've accorded Mr. Giffen to speak, if he wishes, to the

00:57:12 13 Court. What is your suggestion for ordering these

00:57:18 14 remaining matters? Would you like me to hear you first

00:57:23 15 or turn my attention now to Mr. Giffen?

00:57:29 16 MR. CRAVEN: Your Honor, in closing argument

00:57:31 17 I just have a few brief comments. I'm happy to make

00:57:35 18 those, and then we could let Mr. Giffen have an

00:57:39 19 opportunity to speak, if that would be acceptable to the

00:57:43 20 Court.

00:57:43 21 THE COURT: Yes, sir.

00:57:44 22 MR. CRAVEN: Your Honor, despite what Mr.

00:57:51 23 Giffen may submit to the Court from time to time or what

00:57:53 24 he may even tell you here today, I really want to help

00:57:57 25 him. And that's not an easy task, unfortunately, as

00:58:03  1  you heard Dr. Grover testify.  I want him to get well

00:58:09  2  and to get better.

00:58:11  3          And I think the good news is that he does

00:58:14  4  have this positive history of responding well to

00:58:18  5  antipsychotic medication.

00:58:21  6          He is suffering from a serious mental

00:58:24  7  illness that is no fault of his own.  And unfortunately

00:58:30  8  at this point he's sort of his own worst enemy, if you

00:58:34  9  will.

00:58:36  10          But I really applaud Dr. Grover and others

00:58:41  11  here at Butner for consistently trying to get Mr. Giffen

00:58:47  12  to take medication and to get well and to participate in

00:58:50  13  treatment.  There's no reason he has to stay here at

00:58:54  14  Butner indefinitely.  So I am hopeful that something

00:59:00  15  good will happen in the future.  Again, I really want

00:59:04  16  to help him.  It's just not easy, in all candor, at

00:59:08  17  this point in time.  But I hope in the future in his

00:59:14  18  annual reports that he's making progress.  And I would

00:59:19  19  certainly continue to offer whatever help I can to Mr.

00:59:26  20  Giffen, and the staff here at Butner for that matter, to

00:59:29  21  confirm and reiterate everyone's desire that he at least

00:59:36  22  try some of these opportunities and avenues to getting

00:59:42  23  well and to getting better.

00:59:45  24          My guess is that he has a lot of good in

00:59:47  25  him.  And unfortunately we just can't see that from the

| | | |
|---|---|---|
| 00:59:52 | 1 | mental illness.  But I know that he's smart.  He does a |
| 00:59:56 | 2 | lot of legal research.  And I really hope at some point |
| 01:00:01 | 3 | in the future he can thrive and flourish and sort of |
| 01:00:06 | 4 | live happily ever after, if you will. |
| 01:00:09 | 5 | Judge, those are all the comments I want to |
| 01:00:11 | 6 | make at this time.  And I'd be happy to slide the |
| 01:00:15 | 7 | microphone over a little closer to Mr. Giffen. |
| 01:00:17 | 8 | THE COURT:  Thank you. |
| 01:00:25 | 9 | THE RESPONDENT:  Yes, Your Honor.  First, I |
| 01:00:29 | 10 | wanted to -- my attorney just admitted for the record |
| 01:00:34 | 11 | that he's not my lawyer.  And if I don't have a lawyer, |
| 01:00:41 | 12 | the Court -- everything is void, absolutely no |
| 01:00:46 | 13 | jurisdiction if I'm without a lawyer at any critical |
| 01:00:49 | 14 | stage.  It's been like this for 11 months.  For |
| 01:00:53 | 15 | example, when he talks about how I have a mental |
| 01:00:56 | 16 | illness, that's like he's admitting to everything. |
| 01:01:03 | 17 | He has to believe everything I do.  He has |
| 01:01:06 | 18 | to advocate everything I tell him.  And I'm going to |
| 01:01:10 | 19 | give you the law on it.  Okay? |
| 01:01:12 | 20 | So first of all, this may not be perfect, |
| 01:01:16 | 21 | because I'm being held in a facility that doesn't have |
| 01:01:20 | 22 | court access.  I have no lawyer.  I have no law |
| 01:01:23 | 23 | library.  I have no laptop, no cell phone, no legal |
| 01:01:27 | 24 | phone.  And this violates numerous Supreme Court cases. |
| 01:01:33 | 25 | I'm supposed to be allowed to consult with my lawyer |

01:01:36  1   24/7 from the jail.  The Supreme Court ruled that over

01:01:39  2   50 years ago that a judge's order that an attorney and

01:01:43  3   client could not communicate overnight during a recess

01:01:46  4   violated due process.  The jail is supposed to be

01:01:50  5   equipped with 24/7 phones and visiting.

01:01:56  6           This jail has visiting only 10:00 a.m. to

01:01:59  7   3:00 p.m. and requires my lawyer to travel 50 miles from

01:02:04  8   some other city, and he never comes, and there's no

01:02:06  9   phones or nothing.  There's no email.

01:02:09  10          Under *Tennessee v. Lane,* the Supreme Court

01:02:11  11  has said the right to be heard -- um, requires the court

01:02:18  12  to be disability equipped, including having laptops and

01:02:19  13  internet, all under due process, not just the Americans

01:02:21  14  with Disabilities Act, but due process.

01:02:24  15          Under the case law of *Sheehan*  -- and the

01:02:28  16  jails have to be equipped as well.

01:02:30  17          But under the case law called *Sheehan*, the

01:02:33  18  Supreme Court said the Constitution itself now requires

01:02:36  19  reasonable accommodations.  They ruled the Fourth

01:02:39  20  Amendment in *Sheehan* requires police officers reasonably

01:02:44  21  accommodate all subjects.

01:02:46  22          THE COURT:  Let me interrupt just to let the

01:02:48  23  court reporter catch up.

01:02:50  24          I believe you referenced a case, *Sheehan*,

01:02:57  25  S-h-e-e-h-a-n.  Is that what you said?

01:03:00  1    THE RESPONDENT:  Yes.

01:03:01  2    THE COURT:  Thank you.  If you could slow

01:03:04  3  down and speak louder, it would be appreciated.

01:03:15  4    THE RESPONDENT:  Yes.  I'm speaking as loud

01:03:18  5  as I can.  But I'll try to slow down.

01:03:25  6    So anyway, I'm going to give the Court the

01:03:28  7  definition of "counsel," according to the U.S. Supreme

01:03:32  8  Court.  So the Supreme Court ruled 120 years ago -- I

01:03:39  9  don't have the case off the top of my head, because I

01:03:42  10  don't have a law library.  But they ruled that court

01:03:46  11  officers cannot refuse to represent people the Court

01:03:55  12  appoints, whether the case is civil or criminal.  The

01:04:01  13  Court has inherent tolerance, even absent a statute, to

01:04:05  14  require attorneys to submit to the control of basically

01:04:11  15  an agency relationship.  So the Court has power to

01:04:17  16  appoint.

01:04:19  17    What does the word "appoint" mean?  The

01:04:21  18  world "appoint" means to command the lawyer against his

01:04:25  19  will.  He can't use a constitutional argument such as:

01:04:30  20  I have the right to liberty or freedom of association to

01:04:34  21  get out of the Court's command.  That's all

01:04:38  22  "appointment" means.

01:04:39  23    This was discussed by the Supreme Court in a

01:04:45  24  28 U.S.C., 1915 interpretation, a statute of the word

01:04:50  25  "request."  What does the word "request counsel" mean?

01:04:55 1 And they looked at the word "appointment" and "request"

01:04:59 2 and decided "appointment" meant to command; "request"

01:05:03 3 meant that -- only to ask the lawyer to represent a

01:05:08 4 person.

01:05:09 5 And in this -- now, the next phase of

01:05:16 6 establishing the attorney-client relationship, although

01:05:21 7 the Court can command a lawyer to represent a person,

01:05:24 8 the Court cannot require an accused or principal to

01:05:28 9 accept the lawyer because he has a fundamental right to

01:05:33 10 contract, to freedom of association, to speech, even to

01:05:40 11 set an objective and make a complete defense. And this

01:05:46 12 requires the government have a compelling reason to

01:05:52 13 force any citizen to work with any lawyer.

01:05:54 14 So the Supreme Court addressed this in

01:06:00 15 *Faretta v. California,* that the accused or the defendant

01:06:04 16 must acquiesce to take any lawyer. And if you open up

01:06:11 17 *Faretta*, it's a criminal case, but it actually applies

01:06:14 18 to all cases of attorney representation because it's

01:06:21 19 based on the holding that mentions the word "acquiesce,"

01:06:24 20 and it's going to -- the first cite is an agency law

01:06:29 21 case. The Supreme Court states that in this agency law

01:06:34 22 case, citizens are bound by the acts of their counsel.

01:06:39 23 And so this leads me to this other right

01:06:45 24 mentioned in *Faretta*. They do state that all statutory

01:06:49 25 and constitutional powers belong to the defendant or

01:06:53 1　accused personally, such as the compulsory process

01:06:57 2　clause or, in the case of 4247, there's a subpoena

01:07:03 3　right, a right to be present, and so on.  These rights

01:07:07 4　belong to me personally.  And there's other rights

01:07:11 5　mentioned.  It states that I have the right to be

01:07:15 6　present in court physically for face-to-face

01:07:20 7　confrontation of any testifying witness.  I also have

01:07:24 8　the right to hear everything said by a judge or other

01:07:28 9　person.  And this is because the Supreme Court says I

01:07:32 10　have the right to supersede my lawyer at any time and

01:07:36 11　conduct all or part of the defense and even to give my

01:07:41 12　attorney suggestions and orders on what to do in court

01:07:45 13　in real time.

01:07:48 14　　　　　　Now, the rest of agency law, this one --

01:07:54 15　I've got a cite on this one.  It's called -- you have

01:07:56 16　to look up what is the actual definition of "agency law"

01:08:00 17　that they're talking about.  And there's a case called

01:08:03 18　*Henderson*, spelled H-e-n-d-e-r-s-o-n, *v.*, like Victor,

01:08:11 19　then it's called United States -- no, sorry, *United*

01:08:15 20　*Student Aid Funds, Inc.*, and then it's 918 F.3d 1068.

01:08:30 21　And agency law requires me, the principal, to accept an

01:08:39 22　agent.  That's the first step.  I have to ratify a

01:08:44 23　contract with the agent for him to be my lawyer.  And

01:08:49 24　the second part is the lawyer, the agent, he has to

01:08:53 25　agree to my control.  He has to do everything I say,

01:08:57 1  because he's just an agent using my power.  The right

01:09:02 2  of summation and to make closing arguments, those are my

01:09:05 3  powers.  My agent is allowed to speak on my behalf.

01:09:09 4          Now, this *Henderson* cases also states that

01:09:12 5  the minimum requirement to establish an agency

01:09:17 6  relationship are called willful ignorance.  That's

01:09:25 7  where the lawyer constantly, at a minimum, tells me:

01:09:28 8  Hey, I'm here to represent you and be your agent; and

01:09:31 9  then I do not object.  And that's kind of like me

01:09:33 10 passively -- it's where I passively accept him as my

01:09:37 11 lawyer and representative.  He is then allowed to use

01:09:41 12 my powers and argue on my behalf in court.  But he had

01:09:45 13 to first give me the opportunity to object and make a

01:09:48 14 contract with him.

01:09:50 15          Now, there's a second -- now, there's a

01:09:53 16 bunch of other cases on this.  One is called *Washington*

01:09:57 17 *v. Strickland*.  You have to be careful not to mix up

01:10:02 18 effective assistance of counsel cases with these agency

01:10:06 19 law cases.  But this is an effective assistance of

01:10:12 20 counsel case, but it does mention some of the duties of

01:10:17 21 an agent in the agency law context.  They state the

01:10:23 22 lawyer has a minimum duty of complete loyalty to his

01:10:28 23 client.

01:10:28 24          Now, the word "loyalty" has been interpreted

01:10:30 25 in a whole slew of cases to mean that all you have to do

01:10:34  1   is look at the lawyer's statements to find out if he's

01:10:38  2   truly loyal to his client.   For example, one lawyer who

01:10:41  3   was not loyal mentioned in a press release to the news

01:10:45  4   that his client was not amenable to treatment and

01:10:49  5   therefore should receive the death penalty.   So that

01:10:53  6   was evidence his lawyer was never loyal and thus broke

01:10:58  7   the agency relationship.

01:10:59  8          By the way, there are federal rules of

01:11:02  9   agency besides just acceptance, control, and different

01:11:06 10   things.   One of those things is he has to disclose

01:11:09 11   adverse interest for there to be an agency relationship;

01:11:12 12   and he must agree to loyalty, care, and obedience.

01:11:17 13   That's a Ninth Circuit case called *Towery,* T-o-w-e-r-y,

01:11:27 14   *v.,* like Victor, *Ryan,* R-y-a-n.

01:11:31 15          And other loyalty cases they had a lawyer

01:11:35 16   who, in closing argument -- and my lawyer just did

01:11:38 17   this -- in closing argument he tried to distance himself

01:11:43 18   from his own client and said:  I don't agree with doing

01:11:46 19   the defense my client wants, and I don't agree with

01:11:49 20   anything about my client; I think he should be put in a

01:11:52 21   mental hospital on drugs.   That's what my lawyer just

01:11:55 22   said.

01:11:57 23          So other cases where loyalty was questioned.

01:11:59 24   The Ninth Circuit had a case called *Frazier*,

01:12:03 25   F-r-a-z-i-e-r, I think.   And the lawyer told his

01:12:07  1  client:  You're a nigger, and I'm going to be

01:12:10  2  ineffective on purpose.  What's the difference between

01:12:13  3  calling me mentally ill or a nigger?  There is no

01:12:18  4  difference.  That's disloyalty.

01:12:21  5          Now, there's a Supreme Court case on

01:12:24  6  loyalty, *Nix v. Whiteside*.  The client had given his

01:12:30  7  attorney an order that the objective of the defense was

01:12:36  8  to do perjury.  He wanted to present a lie to the Court

01:12:41  9  to get out of criminal charges.  The Supreme Court said

01:12:44  10 that is the only time you're allowed to disobey your

01:12:48  11 client.  They did mention in the case that perjury is

01:12:58  12 fraud on the Court, and the attorney should not present

01:13:01  13 fraud on the Court or perjury.  But they did say in the

01:13:04  14 case the attorney must otherwise do everything he's told

01:13:07  15 and must believe everything he's told.  He has to

01:13:11  16 believe it and speak it, whether he wants to or not.

01:13:14  17 That's part of the control of his client or his

01:13:20  18 principal.  He is only here to tell you what I tell him

01:13:22  19 to do under agency law.

01:13:27  20         There is another case, *Brookhart v. Janis,*

01:13:30  21 which I mentioned before.  That is actually an agency

01:13:33  22 law case as well.  That one involved an attorney doing

01:13:37  23 what my attorney is doing now, where he's refused to go

01:13:42  24 to my defense or speak anything that I told him to

01:13:44  25 speak.  The first thing he told me -- I tried to write

01:13:48  1   a letter to the Court about a month ago.  It was

01:13:51  2   stolen.  The Bureau of Prisons has been stealing all my

01:13:54  3   mail.  Somebody has, either the Court or this prison.

01:13:58  4   And they're coordinating with Joseph Craven to do it,

01:14:02  5   because he told me in July 2012, the only time he

01:14:07  6   visited me, that:  You don't control me.  Oh, yeah?

01:14:13  7   That's exactly what I do.  I control my lawyer.

01:14:16  8   That's what my powers are as principal.

01:14:20  9             So *Brookhart v. Janis*, the attorney merely

01:14:24  10  said:  Your Honor, I have no questions of any of the

01:14:27  11  witnesses, and I have no evidence to present.

01:14:32  12            And then the judge said:  This has the

01:14:34  13  effect of you automatically have to be found guilty.

01:14:40  14            And that's when the accused objected on the

01:14:42  15  record.  He said:  Your Honor, I'm not pleading guilty.

01:14:47  16            And that has the effect of revoking the

01:14:51  17  attorney's agency to do what he was doing, according to

01:14:55  18  the Supreme Court.

01:14:57  19            THE COURT:  Mr. Giffen, may I ask you a

01:15:01  20  question?

01:15:05  21            What do you want to happen to yourself going

01:15:09  22  forward?

01:15:19  23            THE RESPONDENT:  Well, I have things to tell

01:15:26  24  you that will explain to you what I want you to do

01:15:28  25  today, because I have -- I'm forced to represent myself

01:15:31  1  today.  And so I have all the legal arguments.  I've
01:15:35  2  got a few things to point out to you.
01:15:37  3          And I believe what's supposed to happen when
01:15:39  4  it's done, if you follow the law, I will probably be
01:15:44  5  released today.  And I have all the case law from the
01:15:50  6  Supreme Court.  I've got, like, over 50 case laws.
01:15:56  7          THE COURT:  Where would you go, sir, if you
01:15:57  8  were released today?
01:16:01  9          THE RESPONDENT:  Okay.  Well, part of my
01:16:02  10  motion here, my belief is if released today -- and I
01:16:09  11  hope I get to tell you the rest of all this stuff here,
01:16:12  12  because some of this, it's going to blow your mind how
01:16:15  13  many illegal things are happening here right now.
01:16:18  14          Just, for example -- and I didn't tell you
01:16:22  15  the rest of what I have to say.  I've got a Supreme
01:16:25  16  Court case where they already ruled mental patients
01:16:28  17  cannot be held in the Bureau of Prisons because
01:16:31  18  conditions are too harsh.  And I'm going to give you
01:16:35  19  the case to explain it all.  So that right there says
01:16:38  20  I've got to be released anyway.
01:16:40  21          But if I was to be released today, here's
01:16:43  22  what I have.  I believe you should order the Attorney
01:16:47  23  General and the Bureau of Prisons under *DeShaney v.*
01:16:54  24  *Winnebago* to give me about $10,000 to provide for my
01:17:02  25  shelter, food, transportation, and safety and medical

01:17:04  1    care.   And I would immediately go to a hotel to stay in

01:17:09  2    the hotel and get myself arranged and situated, and go

01:17:13  3    to a doctor.  I'm going to go to the emergency room.

01:17:16  4    And I'll tell you why. I have a serious injury right

01:17:18  5    now.   I've got a flesh-eating infection on my penis,

01:17:23  6    and it's on my breast; it's in my nose; it's in my ears;

01:17:27  7    it's in my bellybutton.   And there's a nurse that --

01:17:30  8    the doctors are refusing to treat it because they refuse

01:17:34  9    to come to my room; Dr. Novo [phonetically] and another

01:17:40  10   doctor, K.L.  And the nurse just told me:  Your

01:17:42  11   condition will not improve if those doctors don't come

01:17:45  12   down here.   And she's written, like, 20 emails to them.

01:17:49  13   That's corporal punishment.   And, by the way, if you're

01:17:54  14   corporally punished in a mental hospital, the penalty is

01:17:58  15   automatic release from the commitment.   And I'll give

01:18:01  16   you all the case law on that.

01:18:03  17           THE COURT:  Let me ask another question,

01:18:07  18   where I have heard that earlier pharmaceutical

01:18:16  19   treatments brought great benefits and improvements to

01:18:28  20   you.   What is your perspective on earlier

01:18:31  21   pharmaceutical treatment and whether you would be

01:18:35  22   willing to engage going forward in pharmaceutical

01:18:43  23   treatment?

01:18:47  24           THE RESPONDENT:  Let me just tell you the

01:18:53  25   reason I cited *DeShaney v. Winnebago*.  Both the Ninth

|           |    |                                                             |
|-----------|----|-------------------------------------------------------------|
| 01:18:54  | 1  | Circuit and Second Circuit have ruled jails must provide    |
| 01:18:57  | 2  | 90-day supplies of medication to inmates they discharge.    |
| 01:19:01  | 3  | And I don't see the difference between medication and       |
| 01:19:04  | 4  | shelter and money and food.                                 |

01:19:07   5      But now onto your new question. This

01:19:12   6   question -- first, I want to let you know, because I

01:19:16   7   don't have counsel at this proceeding, and I haven't

01:19:20   8   since the initial appearance, and that was held ex

01:19:24   9   parte, you're not allowed to issue detention orders ex

01:19:28   10   parte. I'm going to give you a lot of case law.

01:19:32   11      THE COURT: I want to know -- sir, I don't

01:19:35   12   want to know about case law in answer to this question.

01:19:39   13   Did you feel that you got better when you took medicine?

01:19:43   14   And would you be willing to take medicine going forward?

01:19:49   15      THE RESPONDENT: Well, here's the thing.

01:19:52   16   I'm just stating this for the record, because *Garza v.*

01:19:57   17   *Idaho* says if a proceeding is scheduled or a person is

01:20:01   18   without counsel, any later commitments are void. So

01:20:05   19   this is all illegal.

01:20:07   20      But I'll answer the question anyway, because

01:20:09   21   I think we're getting into an area where I can't answer

01:20:12   22   questions about medication because there is no civil

01:20:14   23   commitment coming. You have no jurisdiction.

01:20:17   24      But the thing about medication -- let me go

01:20:20   25   ahead and give you a long explanation of who I am.

01:20:24  1    First of all, I fully object to Dr. Grover speaking.

01:20:30  2    And I will give you -- basically, there's several things

01:20:34  3    wrong.   I have requested a *Daubert* hearing because I

01:20:37  4    have the right to contest that she's even using

01:20:40  5    scientific methods before she can testify.   But my

01:20:44  6    motion was stolen by somebody every time I mail it to

01:20:47  7    the Court.   I object to everything she's saying.

01:20:50  8             And on another basis, none of what she's

01:20:52  9    saying was verified by a jury.   There's security video

01:20:59  10   and witnesses to contradict all of that stuff.   So I'm

01:21:02  11   saying that everything she's saying is false.

01:21:04  12            But here's what -- because you're asking me

01:21:05  13   a question that requires a complete defense, including

01:21:10  14   my psychiatrist be called.   I've got a psychiatrist

01:21:14  15   already.   I've got over six or seven psychiatrists, and

01:21:18  16   I'm friends with another ten of them.   And my attorney

01:21:20  17   refuses for them to be present.   So to contest this

01:21:25  18   issue of meds, to give a full statement on it, I can't

01:21:31  19   even do it because I have no lawyer.   I have no experts

01:21:34  20   here.

01:21:35  21            But just for -- to kind of please you, my

01:21:42  22   knowledge on medication, I'm going to give you the

01:21:47  23   United Nations' opinion on this, as well as my own, and

01:21:50  24   a lot of details of a scientific nature.   The United

01:22:01  25   Nations has actually -- the Special Rapporteur on

01:22:01  1   Torture in 2013, has asked the United States to stop

01:22:02  2   using medications because they are not a treatment.

01:22:06  3   The Special Rapporteur on Health in 2017 has asked the

01:22:11  4   United States to modernize its health care system and

01:22:13  5   eliminate medication because they don't work on mental

01:22:16  6   illness.   So the United Nations has spoken.

01:22:21  7             Dr. Grover has committed a fraud on the

01:22:24  8   Court trying to cover her tracks because she uses drugs

01:22:27  9   to assault people and damage their brains and bodily

01:22:30  10   organs.   That's what the United Nations concluded, two

01:22:36  11   different Special Rapporteurs.

01:22:36  12             The international criminal court potentially

01:22:38  13   has Dr. Grover put into prison for 25 years or more.

01:22:43  14   She's killed many mental patients.   She's mutilated and

01:22:48  15   scrambled their brains.   Psychiatry is seen as torture

01:22:52  16   by scientists.

01:22:54  17             Here's the medical facts on antipsychotic

01:22:56  18   drugs.   There's been only one 20-year trial of the

01:23:01  19   drugs ever done.   It's called the Sotier [phonetically]

01:23:05  20   House Study.   It's on psychrights.org.   Jim Gottstein

01:23:12  21   is the author of that website.   He's a lawyer in

01:23:14  22   Alaska, and he's my personal friend.   See, I could have

01:23:15  23   him here to testify today.   I don't have a lawyer.   I

01:23:18  24   couldn't even contact Jim Gottstein.   Jim Gottstein has

01:23:24  25   already been talking to all my other lawyers.   He

01:23:25  1   witnessed my former lawyer abusing me; that's Lisa

01:23:31  2   Ludwig.  He wrote to Lisa and said:  You appear to be

01:23:33  3   running Todd through the motions without trying to win

01:23:37  4   Todd's case.   That's a *Brookhart v. Janis* violation.

01:23:42  5             Anyway, Jim Gottstein's website has on it

01:23:47  6   scientific data.   The Sotier House study studied three

01:23:49  7   groups of mental patients on antipsychotic drugs.   The

01:23:52  8   first group was given no antipsychotic drugs, and they

01:23:57  9   have the highest levels of schizophrenia, the worst

01:24:02  10  delusions.   And they gave them a non-drug treatment

01:24:05  11  regimen and found 80 percent of them recovered from

01:24:08  12  their illness with no medications within 20 years.

01:24:14  13            Then the second group was given

01:24:16  14  antipsychotic drugs for two years.   They found that the

01:24:20  15  drugs prevented the recovery of their psychotic symptoms

01:24:26  16  entirely.   80 percent of the users of antipsychotic

01:24:30  17  drugs were relapsing with chronic voices and illnesses

01:24:35  18  induced by the drugs.

01:24:39  19            After two years they took those

01:24:40  20  schizophrenics off the drugs, and their recovery rate

01:24:45  21  was lower than the group that never received drugs at

01:24:49  22  all.   They started to recover from their schizophrenia

01:24:54  23  though, but only at a rate of 40 percent instead of 80

01:24:58  24  percent within 20 years.

01:25:01  25            Then there's a third group.   The third

01:25:03  1    group was given antipsychotics for 20 years.  Their

01:25:07  2    recovery rate was only 5 percent.  That means 95

01:25:11  3    percent of the time they were relapsing and having

01:25:14  4    chronic symptoms of mental illness solely because they

01:25:20  5    were on antipsychotic drugs.

01:25:23  6         Now, the second piece of data to give you is

01:25:26  7    the death rate.  I have a psychologist who would like

01:25:30  8    to be here today to explain this to you, but I don't

01:25:32  9    have a lawyer.  His name is Dr. Toby Watson.  He's a

01:25:37  10   Ph.D.  I think he lives in Missouri or -- anyway, on

01:25:43  11   his website, look up DrTobyWatson.com.  He has an

01:25:48  12   affidavit.  So some of this information is free.  It's

01:25:51  13   the death rate from antipsychotic drugs.  If you take

01:25:55  14   one antipsychotic drug, you will die 37 percent of the

01:26:00  15   time within 17 years.  If you take two antipsychotic

01:26:05  16   drugs -- actually, you only have to switch your

01:26:08  17   antipsychotic drug.  So if they start you on Seroquel,

01:26:13  18   and then they switch you to Abilify at any point in your

01:26:17  19   treatment, you will die 48 percent of the time.  If

01:26:21  20   they switch your antipsychotic a third time, say from

01:26:25  21   Abilify to Zyprexa, you will die 58 percent -- or 57

01:26:31  22   percent of the time.  So they found there's a

01:26:34  23   correlation between the psychiatric drugs you take and

01:26:37  24   your death rate.  And they say it's because the

01:26:41  25   drugs -- all it does -- it's never been linked to

01:26:46　1　treating a mental illness.

01:26:48　2　　　　　If you go back to MK-Ultra, they studied the

01:26:52　3　major tranquilizers -- that's what they were called that

01:26:55　4　day -- and minor tranquilizers, and energizers, and they

01:27:00　5　found that you can actually only do one thing:

01:27:02　6　chemically lobotomize the brain.  That includes erasing

01:27:07　7　the personality.

01:27:10　8　　　　　There's a study by Dr. Ewen Cameron.  He

01:27:15　9　was a CIA agent, and he used mental patients as guinea

01:27:19　10　pigs at his memorial hospital in Canada.  He was also

01:27:23　11　the head of the APA and the World Psychiatric

01:27:26　12　Association.  He also co-authored DSM-I.  Dr. Ewen

01:27:33　13　Cameron used drugs like Thorazine to cause you to go

01:27:38　14　unconscious for months at a time.  He would administer

01:27:41　15　five different neuroleptic drugs -- they're also called

01:27:47　16　neuroleptic -- and you would never be awake.  During

01:27:50　17　that period of time he would give you ECT, and your

01:27:54　18　personality would erase.  And he found that he could

01:27:58　19　reprogram you with the new personality using a loop tape

01:28:05　20　recorder.  So he would tell you -- basically the

01:28:06　21　problem would be you couldn't remember yourself once he

01:28:09　22　was done with these antipsychotic drugs and the ECT.

01:28:15　23　And whatever he told you would be all that you would

01:28:19　24　know.  If he said your name was Sarah, you would think

01:28:21　25　your name was Sarah.  You would still remember English;

01:28:25  1  you could still count.  But you couldn't tell who you

01:28:31  2  were unless someone told you.  That's what these drugs

01:28:36  3  are used for.

01:28:37  4        I've also seen the doctors use them to

01:28:40  5  induce confessions and pleas in court.  For example,

01:28:44  6  there's a man named Daniel Butts in Oregon.  For three

01:28:49  7  years he was at the Oregon State Hospital unable to aid

01:28:52  8  and assist.  He was incompetent to stand trial.  The

01:28:57  9  doctor refused to admit him claiming he was malingering

01:29:02  10  because he did fine at the hospital without meds.  He

01:29:05  11  would play basketball.  But as soon as he went back to

01:29:08  12  jail, he would start trying to kill himself in his cell

01:29:12  13  and refused to come out.  Well, they went ahead and

01:29:16  14  gave him Risperdal by force, and it damaged his ability

01:29:21  15  to control his will anymore.  And they were able to

01:29:25  16  force him to plead guilty.

01:29:27  17        They're using it as a mind control drug to

01:29:31  18  force inmates to plead guilty.  That's all they're

01:29:34  19  doing with it.  There are effective street drugs, like

01:29:39  20  the street drug dragon's breath [sic].  You can tell a

01:29:43  21  person to draw money from their bank account, and they

01:29:48  22  will and give it to you when they take dragon's breath.

01:29:51  23  So the doctors are trying to damage the brain to make

01:29:54  24  the person more manipulable.

01:29:56  25        Other scientific data on psychrights.org,

01:29:59   1    they studied whether these drugs helped with violence;

01:30:02   2    and the study says: No, they don't.

01:30:05   3         They set up a mental hospital with no drugs

01:30:09   4    inside of it and gave them alternative treatments

01:30:13   5    instead. And to read this study, you're going to look

01:30:17   6    for the Dr. Gotzsche affidavit on psychrights.org; it

01:30:22   7    says Dr. Gotzsche -- Dr. Peter Gotzsche. He is a

01:30:27   8    former AstraZeneca CFO, chief financial officer. And

01:30:33   9    he's a psychiatrist, and he came out as a whistleblower,

01:30:36  10    and he said: These drugs don't treat mental illness.

01:30:40  11    And in his affidavit he compiled this study that said:

01:30:43  12    If you put mental patients in a mental hospital on

01:30:47  13    alternative treatments, they will have no episodes of

01:30:51  14    suicide or assault.

01:30:55  15         Then they set up a second mental hospital,

01:30:58  16    and they gave the drugs there. And they had multiple

01:31:01  17    incidents of assault and suicide, proving the drugs are

01:31:05  18    causing behavioral disorders. The psychiatrists claim

01:31:09  19    these drugs are used to treat danger, but it's not true.

01:31:11  20    There's never been a single study or evidence to back it

01:31:14  21    up.

01:31:20  22         MR. CRAVEN: You need to pause for a moment

01:31:23  23    and let the court reporter catch up.

01:31:26  24         THE COURT: Let's take a pause and let the

01:31:30  25    court reporter rest her wrists.

01:32:54  1        Thank you very much.   I'd like to make some

01:32:58  2   findings on the record that I do have jurisdiction.   I

01:33:02  3   find as a fact that Mr. Craven is the respondent's

01:33:07  4   lawyer.

01:33:08  5        I focus on Fourth Circuit law when I

01:33:14  6   conclude, and in contradiction to what the defendant

01:33:18  7   here urges, that Mr. Craven does not, nor would any

01:33:26  8   lawyer for Mr. Giffen, have to advocate everything that

01:33:35  9   Mr. Giffen told the lawyer to do.

01:33:41  10        I conclude that Mr. Giffen does not, as he

01:33:44  11   announced earlier, have a right to supersede his lawyer

01:33:51  12   at any time.   I focus in making these conclusions upon

01:33:59  13   well established Fourth Circuit law.   A defendant or

01:34:07  14   respondent is not entitled to direct all aspects of his

01:34:13  15   or her case.   Certain decisions that primarily involve

01:34:22  16   strategy, legal strategy, legal tactics, such as what

01:34:30  17   evidence should be introduced, whether stipulations

01:34:37  18   should be entered into, whether objections should be

01:34:42  19   raised, and what motions should be filed may be made by

01:34:52  20   the attorney without the client's consent under

01:34:59  21   circumstances present today.

01:35:06  22        Disagreement with strategy/disagreement with

01:35:10  23   tactics doesn't mean, Mr. Giffen, that you don't have a

01:35:18  24   lawyer, because you do.   You have a very able and

01:35:25  25   experienced lawyer.   And I join in the focus that he

01:35:35 1  places on you getting better.  I share that too.  And

01:35:41 2  I am encouraged about your prior response to earlier

01:35:51 3  pharmaceutical treatments.  And I share the goal, as I

01:35:59 4  know the petitioner does as well, that you not spend the

01:36:04 5  rest of your life at Butner.  But today is not the day

01:36:12 6  for you to leave Butner.

01:36:20 7           I find that the petitioner has established

01:36:25 8  by clear and convincing evidence that Mr. Giffen

01:36:30 9  presently suffers from schizophrenia, and schizophrenia

01:36:36 10 qualifies as a mental disease or defect under Section

01:36:43 11 4246 of Title 18.  And the petitioner has established

01:36:51 12 by clear and convincing evidence that as a result, if I

01:36:56 13 were to release you today, that would create a

01:37:00 14 substantial risk, sir.  And I know you disagree with

01:37:04 15 this, but I conclude it would create a substantial risk

01:37:12 16 of bodily injury to others and/or serious damage to

01:37:19 17 property.

01:37:23 18          I think the opinion of Dr. Grover is

01:37:27 19 plausible; it's well reasoned, and it's supported by the

01:37:32 20 record.  And so I do adopt that report and her

01:37:38 21 testimony.  It supports my finding here today, my

01:37:49 22 finding, sir, that you do meet the criteria for civil

01:37:53 23 commitment, based also on Dr. Stelmach's opinions.

01:38:05 24          Suitable arrangements for state custody and

01:38:08 25 care unfortunately presently are not available.  So I

01:38:15  1  must order you committed to the Attorney General's

01:38:18  2  custody under Section 4246(d) until such time as

01:38:28  3  appropriate, such time as the appropriate state will

01:38:32  4  assume responsibility, sir, for your care, custody, and

01:38:36  5  treatment, or until, as we all hope, your mental

01:38:42  6  condition is improved to such an extent that you're able

01:38:47  7  to leave and be safe in your community.

01:38:56  8           Now, while I'm ordering you committed, Mr.

01:38:59  9  Giffen, I want to remind you that you've got several

01:39:03  10 avenues for obtaining discharge in the future.  Your

01:39:10  11 counsel may petition the Court for your release, or the

01:39:15  12 government may file a certificate of improved mental

01:39:20  13 condition.

01:39:25  14          Mr. Giffen, you're going to have to work

01:39:28  15 hard.  And as a part of that work, sir, keep an open

01:39:33  16 mind.  You have a mind that's very vast and able to

01:39:49  17 recall, able to interpret as you may wish what you

01:39:52  18 understand to be true.  I am asking you, sir, to keep

01:39:59  19 an open mind as to what others in the medical profession

01:40:08  20 would urge you to do.

01:40:15  21          Please comply with your treatment plan.

01:40:19  22 Please go to those groups.  Please work on developing

01:40:25  23 strategy.  As much work as you've put into your

01:40:31  24 understanding of agency law, as it may or may not relate

01:40:37  25 to you and your attorney's relationship -- because I

01:40:41 1   must assure you that time has not been well spent -- but

01:40:47 2   put as much time into developing coping strategies to

01:40:52 3   address your mental health symptoms, and I have no doubt

01:40:56 4   that you can't be successful.

01:41:04 5            THE RESPONDENT:  Your Honor --

01:41:04 6            THE COURT:  So these are my findings and my

01:41:06 7   conclusion.

01:41:09 8            THE RESPONDENT:  Can I please state one

01:41:11 9   small little thing for the record?

01:41:13 10            THE COURT:  Yes, sir.

01:41:13 11            THE RESPONDENT:  Okay.  I'm so glad you

01:41:17 12   agreed to let me speak.

01:41:19 13            Now, here's what I can do to help you

01:41:23 14   understand the law a little better.  And I'm not

01:41:26 15   insulting you, so just let me speak.  I have to tell you

01:41:31 16   something.

01:41:31 17            You can look this up yourself, and you're

01:41:34 18   going to be able to know that what you're saying is

01:41:37 19   wrong.  So you're quoting some text about motions and

01:41:41 20   arguments that can be made.  That comes out of *McCoy v.*

01:41:49 21   *Louisiana*.  And I needed to let you know and clarify how

01:41:51 22   that case is to be read.

01:41:53 23            The Supreme Court actually --  I have here

01:41:57 24   in my motion some stuff about that.  But I'm going to

01:41:59 25   explain it to you.  The Supreme Court has actually

01:42:04 1  never said a lawyer could act over his client's

01:42:07 2  objection.   What they're doing is they're incorporating

01:42:11 3  the American Bar Association rules.   And there's two

01:42:14 4  rules which is co-agency law.   You have to read the

01:42:18 5  context of the quotation from the Supreme Court opinion

01:42:23 6  in the context of what they're being told.   They're

01:42:27 7  pulling these quotes out of the American Bar Association

01:42:30 8  rules.   Here are the two rules in the American Bar

01:42:32 9  Association rules they're quoting.   The first rule is

01:42:35 10  the most important one.   It says:  The attorney must

01:42:39 11  abide by all objectives of the defense.   And then the

01:42:43 12  second rule, that's the rule where it says an attorney

01:42:47 13  may make -- decide what arguments and objections to

01:42:51 14  make, and so on.   There's an asterisk.   You've got to

01:42:56 15  read the asterisk.   It says, "Other restriction above."

01:43:01 16  It says the attorney must abide by all objectives of the

01:43:06 17  defense.   The attorney may decide what witnesses to

01:43:08 18  call and objections to make and arguments to advance.

01:43:13 19  This is simply encoding agency law, which says if

01:43:18 20  there's an objective made, the attorney has to submit to

01:43:21 21  the principal's control.

01:43:24 22          And then, because agency laws allows an

01:43:28 23  attorney to act without the principal's consent if

01:43:32 24  there's willful ignorance, the attorney is not unethical

01:43:36 25  if he's making motions and objections in court, as long

01:43:39  1  as willful ignorance is present.   That's all in the

01:43:44  2  American Bar Association rules.

01:43:45  3        Even the Supreme Court states in *McCoy v.*

01:43:50  4  *Louisiana* that the attorney must at least meet with the

01:43:54  5  client and discuss their trial strategy first before

01:43:58  6  doing any work on the case, before filing any motion, to

01:44:02  7  give the client the opportunity to object and create a

01:44:06  8  new trial strategy.   That is all in *McCoy v. Louisiana*.

01:44:12  9  In fact, the Court -- Justice Scalia is saying if the

01:44:17  10  client objects, that revokes the counsel's agency.   You

01:44:20  11  have to carefully read the American Bar Association

01:44:24  12  rules and the agency law.

01:44:29  13        The Supreme Court also stated -- there's a

01:44:31  14  case called *Gonzales*.   All that they said in *Gonzales,*

01:44:37  15  that an attorney could decide -- consent to jurisdiction

01:44:43  16  by a magistrate, but they said at the bottom:   Only

01:44:46  17  because the defendant never made an objection to his

01:44:49  18  lawyer or to the Court in a letter.   This was all

01:44:53  19  raised on appeal.   And then Justice Scalia is quoted in

01:44:59  20  the concurring opinion, and he said:   Keep in mind we're

01:45:03  21  only deciding the attorney can choose a magistrate judge

01:45:08  22  because there was no objection.   If there had been an

01:45:12  23  objection, that would revoke the agency of the lawyer to

01:45:16  24  decide anything, whether to consent to a continuance, to

01:45:21  25  select an expert, to file a motion, or to consent to a

01:45:25 1    magistrate.  And that text of Scalia is directly quoted

01:45:31 2    in the body of *McCoy v. Louisiana*.  So you have to use

01:45:35 3    the definition of that quote from *Gonzales*.  My

01:45:40 4    attorney is not allowed to do anything over my

01:45:42 5    objection.

01:45:43 6           THE COURT:  Okay.  Mr. Giffen, let's let the

01:45:49 7    court reporter rest her wrists.  It's so important that

01:45:52 8    she be able to.

01:45:55 9           THE RESPONDENT:  I've only got one more

01:45:57 10   thing to tell you.

01:45:57 11           THE COURT:  I'm going to call a pause for a

01:46:00 12   moment and let her rest her wrists.

01:46:00 13           THE RESPONDENT:  Okay.

01:46:22 14           THE COURT:  All right.  You said one more

01:46:23 15   thing you had to tell me?

01:46:27 16           THE RESPONDENT:  Okay.  First of all, I need

01:46:29 17   you to order my lawyer to take this motion and file it

01:46:32 18   in court because it has most of my arguments on it.

01:46:37 19   But it doesn't have one thing on it that I need to tell

01:46:41 20   you in person.  Because what's been happening is when I

01:46:45 21   mail something to the courthouse from my jail cell, it's

01:46:49 22   stolen.  I've got a list of things I mailed to you.

01:46:53 23   None of it has gotten to the courthouse.

01:47:01 24           So here's what I need to tell you.  I

01:47:04 25   wanted to point out that the U.S. Supreme Court --

because I couldn't write this; I've got so limited paper and pen, I couldn't write this in there. The U.S. Supreme Court has recently ruled that Article III judges lack authority to hear civil commitment cases. And I'm going to give you all the case laws on this. Because they decided that only juries can revoke a person's liberty. All right. Here's the cases. It's just U.S. Supreme Court docket . And there's a history. The Supreme Court has ruled it over a dozen times in the past. But for a period of the 70's, it was followed. But it's been recently -- they had a vote on it recently. All right. So here are the cases I want you to have. First of all, the definition of bill of attainder, it used to be that you could not revoke a fundamental right such as the right to liberty or to practice an occupation without a jury trial and a charge tried before a tribunal, a criminal charge. There's all these bill of attainder cases on this in the 1800s.

So here's the case law. It's called Re: Oliver, R-e: O-l-i-v-e-r. In that case the Supreme Court states it's a rule -- it is law that no man's life, liberty, or property shall be forfeited without a charge tried fairly before a tribunal.

The second case: *United States v. Brown*. This is 1950. The Supreme Court ruled that any

01:48:53 1 preventive measures the state wants to use such as

01:49:00 2 forestall danger to the community by dangerously

01:49:02 3 mentally ill people is a bill of attainder because

01:49:06 4 prevention is, in fact, deterrence.  And the bill of

01:49:11 5 attainder clause and due process clause banned

01:49:14 6 deterrence and retribution without a criminal jury

01:49:17 7 trial.

01:49:18 8         Now, the Supreme Court has applied it to a

01:49:22 9 civil commitment case already; it's *Specht v. Patterson,*

01:49:31 10 S-p-e-c-h-t v., like Victor, Patterson,

01:49:36 11 P-a-t-t-e-r-s-o-n.  The Supreme Court ruled the civil

01:49:38 12 commitment statute was, in fact, criminal, and the

01:49:40 13 person had to have a jury trial, and that -- that was

01:49:44 14 the one to read.  They cited *United States v. Brown* and

01:49:49 15 state:  The desire to prevent dangerously mentally ill

01:49:53 16 people and sexual psychopaths from injuring the

01:49:56 17 community requires a criminal trial and it's, in fact,

01:49:59 18 punishment.

01:50:00 19         The next case on this is *Humphrey v. Cady*.

01:50:04 20 *Humphrey v. Cady* stated in it that you can, in fact,

01:50:08 21 enforce through habeas corpus either *Baxstrom v. Herold*

01:50:14 22 or *Specht v. Patterson*.  And many lawyers, however, over

01:50:20 23 the years have failed to enforce *Specht v. Patterson*.

01:50:22 24 They always accidentally argue in court consenting -- or

01:50:27 25 basically agreeing that civil commitment is legal

01:50:31 1  instead of criminal.

01:50:32 2          The next case here is *Stanley v. Georgia* --

01:50:37 3  oh, yeah.   *Humphrey versus Cady* also says I have the

01:50:41 4  right to effective assistance of counsel.   And it

01:50:44 5  creates a procedural default exception if my lawyer

01:50:48 6  doesn't raise this in his -- in the main civil --

01:50:53 7  criminal case.   I can bring it up in a habeas arguing

01:50:57 8  ineffective assistance of counsel.

01:50:59 9          The next case is *Stanley v. Georgia*.   They

01:51:02 10  state that there is no prevention of crimes by citizens

01:51:07 11  such as by banning the tools of crimes.

01:51:13 12          Okay.   Now here are two brand new Supreme

01:51:16 13  Court cases that verify you have no jurisdiction and

01:51:18 14  that civil commitment doesn't exist.   Okay.   *United*

01:51:28 15  *States v. Haymond*, H-a-y-m-o-n-d.   The Supreme Court

01:51:31 16  voted that liberty can only be taken by a jury with

01:51:37 17  "beyond a reasonable doubt" proof.   And Justice

01:51:41 18  Roberts -- what they were trying to decide in this case,

01:51:44 19  there has been a battle over whether the state could

01:51:47 20  really issue things like financial penalties and

01:51:53 21  different things and call them civil.   And in this case

01:51:57 22  they addressed whether a judge had the ability to revoke

01:52:02 23  a supervised release of a sexual offender and issue a

01:52:06 24  prison sentence because he was found with child porn.

01:52:10 25  And they said:   No, judges can't decide guilt whatsoever

01:52:14  1   or skip liberty, only juries can.  Now, that's why

01:52:20  2   civil commitment is done in the United States.

01:52:23  3           Now, the next case on this is *Kokesh v. SEC*.

01:52:34  4   This case decided that anything done to prevent crimes

01:52:38  5   by individuals is, in fact, a bill of attainder or

01:52:44  6   punishment.  And they said:  What's the difference

01:52:46  7   between civil and criminal in this case?  They said

01:52:49  8   civil is for injuries between private parties, and

01:52:54  9   criminal is for when the government wishes to punish or

01:53:03  10  penalize a person.  So basically they define civil

01:53:06  11  commitment as criminal according to *Kokesh v. SEC*

01:53:09  12  because it seeks to forestall danger to the community.

01:53:14  13  And this has just been, like, two years ago that they

01:53:16  14  ruled that.

01:53:18  15          Okay.  Now, the final piece to this is:

01:53:21  16  What does the common law of England require?  So due

01:53:26  17  process by definition is whatever -- you first look at

01:53:31  18  what the U.S. Constitution requires, and then if it

01:53:35  19  doesn't have anything, you then look to the common law

01:53:38  20  of England to decide what due process is.

01:53:42  21          THE COURT:  Okay.  Thank you very much, Mr.

01:53:45  22  Giffen.

01:53:45  23          THE RESPONDENT:  Okay.  The common law of

01:53:49  24  England requires a jury trial to decide if a person is

01:53:55  25  mentally ill or insane.  And I have a white paper on it

01:53:58  1    on my website.  I am supposed to receive a jury trial

01:54:00  2    today.

01:54:00  3                 And the other thing, I need this motion -- I

01:54:05  4    need you to order my lawyer to file it because I can't

01:54:08  5    mail it to you, and I need to file both a habeas corpus,

01:54:13  6    a 2241, and I need you to get a copy of it as well.

01:54:17  7                 THE COURT:  Okay.  Well, I have heard you

01:54:20  8    today, sir, and I have made my decision.

01:54:29  9                 And I thank you all.  We stand adjourned.

10                 (Concluded at 11:55 a.m.)

11                                 - - -

12

13                      **C E R T I F I C A T E**

14

15       I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled

17    matter.

18

19    /s/ Tracy L. McGurk_____               ___7/10/2023___

20    Tracy L. McGurk, RMR, CRR                     Date

21

22

23

24

25